Carol ANDREWS *v.* STATE of Arkansas

CR 78-220                                     578 S.W. 2d 585

Opinion delivered April 2, 1979
(In Banc)

*Robert C. Marquette* and *Douglas W. Parker,* for appellant.

*Steve Clark,* Atty. Gen., by: *E. Alvin Schay,* Asst. Atty. Gen., for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Carol Andrews, 38 years of age, was charged by Information with capital murder under Ark. Stat. Ann. § 41-1501 (1)(d),[1] it being alleged that on January 30, 1978, he murdered J. R.

---

[1]This particular sub-section was a mistake as will be pointed out subsequently in the opinion.

Gillen and Maggie Gillen. Andrews was committed to the state hospital for examination, at which time he was examined by Dr. A. F. Rosendale, M.D., examining psychiatrist, whose report reflected that his findings were derived from:

1) Historical data from outside sources; 2) Medical history and physical and neurological examinations by the examining physicians; 3) Laboratory and other physical studies; 4) Psychological assessment by staff psychologist; and 5) Psychiatric history and direct physiciatric examination by the examining psychiatrist.

The doctor diagnosed Andrews as being without psychosis, his opinion stating:

It is the opinion of the examining psychiatrist that Carol Andrews is not mentally ill to the degree of legal irresponsibility at the time of this examination and probably was not at the time of the commission of the alleged offense.

It is further the opinion of the examining psychiatrist that Carol Andrews has the mental capacity to understand the proceedings against him and has the mental capacity to assist effectively in his own defense; and, that he was probably not suffering from mental disease or defect of such degree as to make him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Prior to trial, which was held on July 10, 1978, appellant moved that a psychiatrist be appointed for the purpose of examining him, such expense to be paid by county funds, since he was an indigent, and he also moved that Ark. Stat. Ann. § 41-601 (Repl. 1977) be declared unconstitutional since the statute declares that the defense of insanity is an affirmative defense, and thus places the burden of proof on the defendant. The court denied both of these motions and after conducting a hearing on the voluntariness of the confession, the case proceeded to trial. On trial, appellant was found guilty of capital murder and was sentenced by the court to life in prison without parole, the state having announced it was

offering no evidence or testimony in regard to aggravating circumstances. From the judgment so entered, Andrews brings this appeal, and for a reversal relies upon four points, which he sets out and which we proceed to discuss in the order listed.

## I. THE COURT ERRED IN FINDING THE WRITTEN STATEMENT OF DEFENDANT AND RELATED ORAL STATEMENTS TO HAVE BEEN MADE VOLUNTARILY AND WITHOUT UNDUE INFLUENCE OR COERCION, DENYING DEFENDANT'S MOTION TO SUPPRESS SAID STATEMENTS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THE 5TH AMENDMENT TO THE ARKANSAS CONSTITUTION.

The record reflects (from his written statement) that Andrews, an employee of Gillen at a garage in Mountainburg, became involved in an argument with Gillen during the afternoon of January 30, 1978. Both had been drinking and during the argument, when Gillen (according to Andrews) made some disparaging remarks about Andrews' father, who had died a few days previously, Andrews grabbed a .22 rifle which was in the garage and fired at Gillen, hitting him behind the left ear. About this time, Andrews' son, Terry, came into the garage. According to Andrews, Gillen then grabbed the axe and started swinging it at the appellant, but Andrews took the axe away and Gillen ran outside. Appellant chased him, pulled him back into the garage, and began to beat Gillen over the head with a sledgehammer. Maggie, Gillen's wife, then ran in and while she was bending over her husband, Andrews picked up the axe and hit her numerous times in the head, both Gillens dying from the wounds inflicted.[2] Terry assented to his father's request to help cover the bodies with a piece of plastic. They then left and walked over to the Roadrunner Cafe where Andrews' brother, Tommy, was employed, to get a cup of coffee. The next morning, the three men placed the bodies in a station wagon belonging to Gillen and drove to a wooded location in Logan County where the car and bodies were left. About three days later, the car and

[2]After Andrews killed Mrs. Gillen, he took $51 or $52 from her purse.

bodies were found and the matter reported to the sheriff of Logan County. This sheriff then notified the sheriff of Crawford County that the car and bodies had been found; that the car was registered to Gillen, but that the bodies had not been identified. That afternoon (February 3, 1978), Trellon Ball, sheriff of Crawford County, went to Gillen's garage to see if he was there. Andrews was found inside the garage. The sheriff inquired about Gillen and was told by Andrews that he had not seen him since the previous Monday and that he (Andrews) was there because he was the mechanic for the garage. It being cold, Andrews, the sheriff, and one of the sheriff's deputies who had accompanied him, Bill Grill, went inside the garage and Grill observed blood spots on the door; blood spots were also noted on the ground outside the building. Ball also noticed blood spots on a car within the building and the floor sweep on the floor. About this time, Marshall Wright of Mountainburg drove up and Andrews stated that he wanted some coffee, and he and Wright went to a cafe for coffee. Upon their return, Sheriff Ball asked Andrews to get into his car. Andrews was first read the Miranda rights by Ball, and about that time people from the state police crime laboratory began arriving. Andrews, Sheriff Ball, Deputy Sheriff Grill, and Bobby Underwood (a member of the auxiliary sheriff's mounted patrol) were in the car, and the officers proceeded to interrogate Andrews. This was about 3:30 p.m. and the questioning lasted until 8:30 or 9:00 p.m. State Investigator DuVall arrived about 8:00 p.m. and engaged in the interrogation from that time. According to Andrews, the officers would not let him leave the car, or relieve himself, and he stated that he was told if he opened the door he would be shot. Appellant also said that he was not given anything to eat while in the car and had only a "soda pop." He said that he requested a lawyer, but this was denied; and still further, that DuVall shook his fist in his face. There was no contention that he was beaten or struck by the officers. About 9:00 p.m., Andrews was taken to the Crawford County Court House where he was asked if he wanted to make a statement, to which appellant replied in the affirmative. Deputy Grill then again read to him his "Miranda rights" and Andrews executed a waiver and after brief questioning, proceeded to make a statement. It took about two hours to take the statement and write it up, after which appellant signed same.

As earlier stated, the court conducted an in-chambers hearing relative to the voluntariness of the confession, and at the conclusion thereof, held that the oral statements made to the sheriff and Grill, as well as the written statement were made freely and voluntarily.[3]

In arguing that all statements made by Andrews were involuntary and under undue influence, appellant urges the court to look at the totality of the circumstances, i.e., appellant's length of confinement, lack of refreshment or relief, coercive nature of the questioning, understanding of his Miranda warnings, and his mental competency to give a knowing statement. Appellant concedes that "each of these factors, in itself, might not be sufficient to afford evidence that the statements were involuntary," but states that when "viewed together they cast grave suspicions and doubt on the finding of the trial court judge's decision to admit said statements into evidence."

Of course, the fact that a confession is made after a prolonged period of questioning does not necessarily render the confession inadmissible. In *Ashdown* v. *State,* 357 U.S. 426, 78 S. Ct. 1354, the Supreme Court affirmed a Utah case wherein the petitioner's oral confession was obtained after a 5 1/2 hour interrogation that took place immediately following the defendant's husband's funeral, and likewise, in *U.S.* v. *Lind,* 542 F. 2d 598 (2d Cir. 1976), the court found as unpersuasive the appellant Lind's contention that his confession was involuntary because, *inter alia,* he was questioned for more than eight hours. It would thus appear that the period of interrogation is but one factor that may be considered in determining whether a confession was voluntarily made. Here, the testimony reflects that Andrews was first given his Miranda warning prior to any interrogation, and in fact, this was admitted by appellant. Contradictory to appellant's statement, the record does reflect that Andrews got out of the car at least one time and deputy Grill said that he was given a hamburger and Coca Cola while in the car. As to the statement that trooper DuVall shook his fist in appellant's face, DuVall

---

[3]There was a statement made to Trooper DuVall (hereafter mentioned) which the court felt to be voluntary, but he did state that he would not issue a definite ruling on that particular statement until later. For that matter, none of the statements made orally were ever offered at trial.

denied that this happened, but did state that he pointed his finger and said "You did it, didn't you?" and Andrews replied, "Yes, sir." During the entire questioning in the automobile, this was the only occasion where Andrews admitted the killings, and this oral statement was not offered into evidence. Andrews not only admitted that his rights were read to him, but he testified that he understood them. While appellant stated that he requested an attorney while in the automobile, the officers testified that they heard no such request made. Of course, this is not a matter where appellant was worn out, excited, or exhausted from the events of the day (as might have been contended with more logic on the day of the killings), but rather the events being discussed took place three days later. In other words, he was certainly not under pressures that would have been applicable on the day of the murders. In *Tucker* v. *State,* 261 Ark. 505, 549 S.W. 2d 285 (1977), this court set out its general rule of review of in custody confessions as follows:

> When an in-custody confession is obtained and the voluntariness of a confession challenged we make an independent determination of the issue from a review of the entire record and in making such a review look to the totality of the circumstances surrounding the confession. However, we will not set aside the finding of voluntariness by the trial court unless the finding is clearly against the preponderance of the evidence. *Degler* v. *State,* 257 Ark. 388, 517 S.W. 2d 514 (1974).

We are unable to say that the finding of voluntariness by the trial court was clearly against the preponderance of the evidence.

II. THE COURT ERRED BY OVERRULING DEFENDANT'S MOTION TO HAVE THE COURT APPROPRIATE FUNDS FOR THE EXAMINATION OF DEFENDANT BY A PSYCHIATRIST AND THE EMPLOYMENT OF SAME TO AID DEFENDANT IN HIS DEFENSE, SAID REFUSAL VIOLATING DEFENDANT'S CONSTITUTIONAL RIGHTS UNDER THE 14TH AMENDMENT TO THE UNITED STATES

CONSTITUTION AND THE 6TH AMENDMENT
TO THE UNITED STATES CONSTITUTION.

Appellant cites the case of *Gideon* v. *Wainwright,* 372 U.S.
335, 83 S. Ct. 792, as supporting his contention that the court
has a mandatory duty to appropriate funds for the appoint-
ment of a psychiatric expert "where the circumstances in a
criminal prosecution include both the indigency of the defen-
dant and the announced defense of mental defect or disease."
Of course, *Gideon* held that an accused in all criminal
prosecutions has the right to have the assistance of counsel for
his defense but does not deal in any respect with the appoint-
ment of a psychiatric expert to assist in the defense.
Appellant urges, however, that this court extend the scope of
that decision to include such an appointment. We decline to
do so. Ark. Stat. Ann. § 43-1301 (Repl. 1977), requires that
whenever a person charged with crime enters a defense of in-
sanity, he must be examined, at county expense, at the State
Hospital or at a regional mental health facility. This, of
course, was done. Our court has passed on the particular
question several times. In *Hale* v. *State,* 246 Ark. 989, 440
S.W. 2d 550 (1969), we said:

> Furthermore, the record shows that the State did furnish
> to appellant the services of a psychiatrist. The psy-
> chiatrists furnished to appellant were selected by the
> State not for criminal work but for treatment of mental
> diseases. The State Hospital staff is only incidentally
> used to determine mental competency of criminal de-
> fendants. Selection of psychiatrists on the State Hospital
> staff is done by the Governor or through his appointees
> and is not in any way controlled by the persons charged
> in this state with prosecuting criminal defendants.
> Under this procedure we can find no denial of due
> process or equal protection of the laws to the prejudice
> of appellant.

> Surely due process of law does not require the state to
> furnish expenses for appellant to shop from doctor to
> doctor until he finds one who considers him mentally in-
> competent.

See also *Grissom v. State,* 254 Ark. 81, 491 S.W. 2d 595 (1973) and *Maxwell v. State,* 259 Ark. 86, 531 S.W. 2d 468 (1976).

In accordance with what has been said, the ruling of the trial court did not constitute error.

III. THE COURT ERRED BY OVERRULING DEFENDANT'S MOTION PRIOR TO OPENING STATEMENTS: THAT ARKANSAS STATUTE SECTION 41-601 IS UNCONSTITUTIONAL IN REQUIRING THE DEFENSE OF MENTAL DISEASE OR DEFECT TO BE AN AFFIRMATIVE DEFENSE, SAID STATUTE IN VIOLATION OF THE 14TH AND 5TH AMENDMENTS TO THE UNITED STATES CONSTITUTION, IN THAT IT IS AN UNLAWFUL COMPULSION ON DEFENDANT TO TESTIFY AND ALSO VIOLATIVE OF THE DUE PROCESS REQUIREMENT THAT THE PROSECUTION MUST PROVE BEYOND A REASONABLE DOUBT EACH ELEMENT NECESSARY TO CONSTITUTE THE CRIME CHARGED.

Ark. Stat. Ann. § 41-601 (1) (Repl. 1977), provides:

It is an affirmative defense to a prosecution that at the time the defendant engaged in the conduct charged, he lacked capacity, as a result of mental disease or defect, to conform his conduct to the requirements of law or to appreciate the criminality of his conduct.

It is appellant's argument that § 41-601 (1), by its very language, has forced him to attempt to disprove the premeditation and deliberation required to be established by the state.

A similar argument was presented to the United States Supreme Court in *Leland v. Oregon,* 343 U.S. 790, 72 S. Ct. 1002 (1952). There, the court upheld an Oregon provision requiring the defendant to prove the defense of insanity beyond a reasonable doubt. In making its decision, the court

noted that the burden of proving all elements of the crime beyond a reasonable doubt, including the elements of premeditation and deliberation, was placed on the state and remained there throughout the trial. Only after finding that each element of the crime had been established beyond a reasonable doubt was the jury to consider the independent issue of legal sanity. The court concluded that this practice did not offend the defendant's due process rights even though the Oregon standard of proof for insanity *required that this be shown beyond a reasonable doubt.* This goes far beyond our statute, Ark. Stat. Ann. § 41-110 (Repl. 1977), which states:

> (4) The defendant must prove an 'affirmative defense' by a preponderance of the evidence. An 'affirmative defense' is any matter:
>
> (a) so designated by a section of this Code; or
> (b) so designated by a statute not a part of this Code.

Appellant argues that *Leland* is no longer the applicable law for this court to follow. In making this argument, he cites *In Re Winship,* 358 U.S. 364, 90 S. Ct. 1068 (1970). There, the court held "that the due process clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact necessary* to constitute the crime with which he is charged," i.e., before a court may constitutionally allocate the burden of proving any fact to the defendant, the state must first prove every element of the offense charged and must first determine whether that fact is an element of the crime charged. This was done in the present case. *Winship* established the foundation upon which the Supreme Court based a later decision, *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881 (1975), which appellant contends means that the "continued viability of *Leland* appears doomed."

In *Mullaney,* the court held that a defendant was not required to disprove an element of murder in order to reduce the offense to manslaughter. The case did not involve the issue of insanity, in any way, and, at any rate, the United States Supreme Court in *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, held contrary to appellant's assertions, in which it stated:

The Chief Justice and Mr. Justice Rehnquist, concurring, expressed their understanding that the *Mullaney* decision did not call into question the ruling in *Leland* v. *Oregon,* supra, with respect to the proof of insanity.

Subsequently, the Court confirmed that it remained constitutional to burden the defendant with proving his insanity defense when it dismissed, as not raising a substantial federal question, a case in which the appellant specifically challenged the continuing validity of *Leland* v. *Oregon.* This occurred in *Rivera* v. *Delaware,* 429 U.S. 877 (1976), an appeal from a Delaware conviction which, in reliance on *Leland,* had been affirmed by the Delaware Supreme Court over the claim that the Delaware statute was unconstitutional because it burdened the defendant with proving his affirmative defense of insanity by a preponderance of the evidence. The claim in this Court was that *Leland* had been overruled by *Winship* and *Mullaney.* We dismissed the appeal as not presenting a substantial federal question.

Likewise, in *Duisen* v. *Wyrick,* 566 F. 2d 616 (8th Cir. 1977), the court squarely addressed the issue of whether *Leland* was still good law in light of *Winship* and *Mullaney.* There, the court stated:

Any doubts as to the merits of petitioner's argument are settled by the recent Supreme Court case of *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319. In *Patterson,* the Supreme Court expressly declined to overturn its holding in *Leland.* Consequently, the decision of the District Court to dismiss this action with prejudice is affirmed.

From what has been said, it clearly appears that the logic of the federal courts in discussing this issue is simply that sanity is not an element of the crime; rather, it involves the separate issue of capacity, and thus the burden of proof may be constitutionally placed on the defendant.

Counsel for appellant conducted a very thorough and lengthy cross-examination of Dr. Rosendale, actually cover-

ing 44 pages of the transcript. Dr. Rosendale stated that he had examined over 300 psychotic patients, who were retained for treatment, but "never once have I examined a patient, psychotic patient, who went to the extent that this man did to conceal their evidence. Most of them just walk off and leave it, and make no efforts to cover their tracks, and make no attempts at evasion of apprehension." Andrews, who testified at trial, stated that he had received two Congressional medals for fighting in Vietnam, had served with the CIA, and had been directed by President Kennedy to assassinate the president of the Dominican Republic; further, that he was involved in the assassination of Dr. Martin Luther King, which was ordered by President Johnson. He described experiences in Vietnam which included the year 1965, when appellant stated that he was a prisoner of war,[4] gave his military serial number (which did not exist), said that Gillen was a fellow prisoner in a POW camp with him in Vietnam; that Gillen collaborated with the enemy, which was one reason he wanted to kill him. It was the opinion of Dr. Rosendale that Andrews was fantasizing. The record reflects the following:

Q. All right, would you please tell this jury in what manner you would be able to diagnose whether or not he was fantasizing or whether he was hallucinating that he was in the military service.

A. Well, in the first place he had no trouble whatsoever in maintaining an oral idea, and a psychotic person cannot do that. He would start talking about something, I could interrupt him and ask him a question, and he would go back to his original chain of thought, and he would complete it. He would complete his idea what he was talking about. He would not insert an inappropriate term during the time he was discussing this. His effect was quite appropriate, he showed no signs of anxiety, he was perfectly relaxed, and this you do not find with patients who are psychotic.

Q. You mean a psychotic person is not relaxed?

[4]The records reflected that he was in Oklahoma State Penitentiary in 1965.

A. No, sir, they are not relaxed.

Q. You mean that they don't sit around down at the Hospital in a very passive state in any event?

A. Well, after you put them on medication they will.

On direct examination, Dr. Rosendale had distinguished between a fantasy and a delusion, stating:

A. He could actually believe it. And in that case this would be a delusion. We would say that he is psychotic. But in the instant case, in my opinion, and the opinion of the doctors at the State Hospital, this was strictly a fantasy.

Q. That would in no way affect, or would it affect the opinion which you and the staff ultimately rendered?

A. No, sir.

So as far as you and the staff are concerned, he is or was, in your opinion, mentally competent on January 30, and during the period of time he was examined he was mentally competent. Is that a correct statement?

A. Yes, sir.

The son and brother verified that Andrews had made statements to them similar to those heretofore mentioned.[5]

In the case before us, the trial court instructed the jury that the burden was "upon the state to prove the defendant's

---

[5]Entirely aside from the question of sanity, Andrews, on trial, testified that he shot Gillen because he was trying to get Gillen to turn his son, Terry, loose; that Gillen ran outside and appellant tossed Terry the gun and went out to bring Gillen back. According to Andrews, they placed him in a chair and Terry struck Gillen several times with a sledgehammer; about that time Mrs. Gillen came in and Terry hit her with the axe. The witness said she was making a "funny noise" and Terry "went back and he got a small poker and put on her neck, and I went over there and taken the poker off. He was standing on each side of it with his feet." Placing the poker on Mrs. Gillen's neck and putting the pressure on with feet apparently did happen, but Terry testified that both the killing and the latter incident were done by his father.

guilt of each element of the offense with which the defendant is charged to your satisfaction beyond a reasonable doubt." On the issue of insanity, the court instructed the jury that the defendant is required to prove it "now, however, beyond a reasonable doubt, but only to your reasonable satisfaction." We have concluded that error was not committed.

IV. THE COURT ERRED IN NOT GRANTING THE REQUEST FOR A DIRECTED VERDICT OF DEFENDANT WHERE NO EVIDENCE HAD BEEN PRODUCED THAT EITHER OF THE DECEASED HELD PUBLIC OFFICE AT THE TIME OF THEIR DEATH. AS STATED IN THE INFORMATION, SAID ACT BEING IN VIOLATION OF ARKANSAS STATUTE 41-1501 (1)(d).

Ark. Stat. Ann. § 41-1501 provides as follows:

(1) A person commits capital murder if:
(a) acting alone or with one or more other persons, he commits or attempts to commit rape, kidnapping, arson, vehicular piracy, robbery, burglary, or escape in the first degree, and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life; or
(b) . . .
(c) with the premeditated and deliberated purpose of causing the death of any person, he causes the death of two (2) or more persons in the course of the same criminal episode; or
(d) with the premeditated and deliberated purpose of causing the death of the holder of any public office filled by election or a candidate for public office, he causes the death of any person; or . . .

While the Information correctly charged Andrews "did unlawfully and willfully and with the premeditated and deliberated purpose of causing the death of J. R. Gillen, cause the death of J. R. Gillen and Maggie Gillen in the course of the same criminal episode; said act being in viola-

tion of Ark. Stat. Ann. § 41-1501 (1)(d), against the peace and dignity of the State of Arkansas, . . . " it erroneously listed the sub-section as (d), instead of sub-section (c) and at the arraignment, which occurred more than four months prior to the trial, the court told appellant and his counsel that he was charged with violation of § 41-1501 (1)(d). As stated, this was the wrong sub-section, the actual charge as set out in the Information actually referring to (c). There was no evidence at all that either of the deceased persons had ever held any public office, and it was quite apparent that this was simply an error in typing up the Information. The important matter is that the court, in instructing the jury, correctly stated the substance of the charge. There has been no showing by appellant that he was in any way prejudiced by the mistake in the Information (such as preparing the wrong defense), and the entire record denotes that this was simply harmless error. In *Baker* v. *State,* 200 Ark. 688, 140 S.W. 2d 1008, Baker was convicted of embezzlement under § 3151 of Pope's Digest, and it was contended that he was charged under the wrong section, appellant arguing that the particular section applied only to employees of private businesses, co-partnerships or private corporations; that Baker's conviction was based on embezzling funds belonging to the school district, which of course was not a private concern. This court held that the fact that the pleader attempted to proceed against Baker for the embezzlement of funds belonging to the school districts named in the Information under § 3151 did not entitle appellant to a discharge if the Information were good under any other section of the statutes, and further held that the Information did charge him with a crime under § 3153 of Pope's Digest, and the fact that the pleader attempted to proceed under § 3151 was immaterial. We said:

> Appellant now argues, in regard to this last section, that it may not be invoked to sustain the conviction of the appellant for the reason that the information, as set forth above, was prepared and filed and was meant to charge an offense under the aforesaid § 3151 of Pope's Digest and that this is apparent from the language used. It may be true that the pleader in drafting his information had before him and in mind the language of the aforesaid statute and followed the same to some extent

in the preparation of the charge upon which appellant was tried, but it certainly does not necessarily follow, as a matter of law, that because thereof, even if true, the defendant must be discharged. Certainly, if by reasonable construction the language of the information charges an offense against the laws of the State under any other provision of the statutes, the ineptitude of the pleader's diction would not operate to nullify the proceedings.

Of course, in the case now before us, the language of the Information did specifically charge an offense against the laws of the state under the very preceding sub-section of the statute, and, as stated, there was no showing of surprise or that the defense of Andrews was prejudiced in any manner by use of the wrong sub-section, particularly since the offense itself was clearly set out in the Information. There is no merit in appellant's contention.

In accordance with Ark. Stat. Ann. § 43-2725,[6] we have reviewed all objections made by appellant during the course of the trial and find no prejudicial error.

Affirmed.

---

[6]"The Supreme Court need only review those matters briefed and argued by the appellant provided that where either a sentence for life imprisonment or death, the Supreme Court shall review all errors prejudicial to the rights of the appellant."