Michael Ray ORNDORFF, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

James William HOLMES, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

Hoyt Franklin CLINES, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

Darryl RICHLEY, Appellant,

v.

A.L. LOCKHART, Director, Arkansas Department of Correction, Appellee.

Nos. 91–3510 and 91–3512 to 91–3514.

United States Court of Appeals, Eighth Circuit.

Submitted June 8, 1992.

Decided July 15, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 21, 1993.

Kenneth Breckenridge, Hot Springs, AR, argued, for Orndorff.

Gerald A. Coleman, West Memphis, AR, argued, for Clines.

Mark S. Cambiano, Morrilton, AR, argued, for Richley.

Jackie Ward Gillean, Deputy Atty. Gen., Little Rock, AR, argued (Winston Bryant, Atty. Gen., and Olan W. Reeves, Sr. Asst. Atty. Gen., on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

HENLEY, Senior Circuit Judge.

We visit this habeas case for the second time. Michael Ray Orndorff, James William Holmes, Hoyt Franklin Clines, and Darryl V. Richley (petitioners) appeal from the judgment of the district court denying their requests for habeas relief under 28 U.S.C. § 2254. Petitioners were convicted of capital murder and were sentenced to suffer the death penalty. The district court found that at trial petitioners were denied their sixth amendment right to confront the witnesses against them. The court granted petitioners partial relief, finding that this error was harmless with respect to their convictions and affected only their death sentences. Respondent Lockhart concedes the error at trial, but contends this error was harmless with respect to the convictions and sentences. We affirmed that part of the decision denying relief and remanded for further consideration. *Orndorff v. Lockhart*, 906 F.2d 1230 (8th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991). On remand from this court, the district court held that the error was harmless with respect to the petitioners' sentences and denied their requests for habeas relief. We affirm in part and reverse and remand in part.

### I.

Petitioners broke into and robbed the house of Don Lehman in Rogers, Arkansas. In addition to stealing several hundred dollars and some guns, one or more of the petitioners shot and killed Don Lehman and threatened to kill his wife and daughter, who were in the house at the time.

At trial, Don Lehman's daughter, Vicki Lehman, testified in great detail about the murder-robbery. In addition to her trial testimony, she gave the police two statements which were recorded and transcribed: one within hours after the murder and another several days later. Although there are some variations between her trial testimony and her two pretrial statements, there are many similarities in her descriptions of what happened that night.

Vicki Lehman has consistently stated that at approximately 9:45 on the evening of January 8, 1981, she heard the front doorbell ring and got out of bed to go to the door. Vicki met her father in the hall on the way to the door and followed closely behind him. When her father unlocked the door, four men wearing ski masks forced their way into the house and attacked him. Vicki was held at gunpoint by one of the men while two or three others attempted to subdue her father who was struggling. Vicki was ordered to kneel down, face the wall, and put her head in her hands. She could sense that the fight had moved down the hall and into the bedroom. Vicki then heard two gunshots. Moments later, one of the men grabbed her by the back of the hair and led her through the house, searching for money and other valuables.

Vicki has consistently described the four attackers as follows: (1) the tallest man who wore wire rim glasses that were visible through the ski mask, later identified as petitioner Richley; (2) the heavy or biggest man, later identified as petitioner Holmes; (3) the short or smallest man, later identified as petitioner Orndorff; and (4) the medium-sized man who removed his mask during the robbery, later identified as petitioner Clines. She got a very good look at the man who removed his mask, and within hours after the murder helped an investigator create a composite drawing of that man. Several days later she positively identified petitioner Clines in a line-up.

Vicki has also consistently described the sequence of events as she was led through the house. After she heard the gunshots, the tallest man with the glasses grabbed her and demanded to know where some money

was. This tall intruder never let go of her until he left and constantly had his gun pointed at her head or back. She led him into her bedroom and produced an envelope containing some money she had received for Christmas. From her bedroom, Vicki was taken back down the hall, upstairs to a loft or office area above the main room, and then back downstairs. She was then led into her parents' bedroom where she saw her father laying motionless on the bed and her mother cowering in the corner. While in that bedroom, the medium-sized man found several hundred dollars in a drawer. He became excited and removed his mask. Then he and the heavy man began tearing out drawers and throwing clothes about the room searching for more money. The smallest man then suggested that she be allowed to call an ambulance for her father.

Vicki was taken into the kitchen area to use the phone. Before she was able to make the call, however, the medium-sized man grabbed the phone from her and stated she was not going to call anyone. Vicki then stared eye-to-eye with this unmasked man. All four attackers were in the kitchen area and they demanded more money and guns. Vicki directed them to the gun cabinet in the living room. The tallest man, still holding Vicki, ordered two of the attackers, the smallest and medium-sized man, to get in the car and ordered the heavy man to remove the guns from the cabinet. The heavy man took the guns out to the car and the tallest man followed.

The police arrested all four petitioners within several days of the murder. After a joint trial, petitioners were convicted of armed robbery and capital murder. The death penalty was imposed on all four.[1] Petitioners exhausted their state remedies and filed petitions for habeas corpus relief in federal court. Petitioners raised several claims in their habeas petitions, but only one was found to have merit.

After petitioners had appealed to the Arkansas Supreme Court, they discovered that Vicki Lehman had been hypnotized prior to trial in an attempt to enhance her memory. The prosecutor had arranged for this hypnosis, but failed to inform the defendants or the trial court. In their habeas petitions, petitioners claimed they were denied their sixth amendment right to confront the witnesses against them because they were denied the opportunity to cross-examine Vicki Lehman about the hypnosis.[2] The district court found that the prosecutor's failure to inform the defendants about this hypnosis was constitutional error. The court further found that this error was harmless with respect to the petitioners' convictions of capital murder, but held that the error was not harmless with respect to the petitioners' sentences. *Orndorff v. Lockhart*, 707 F.Supp. 1062 (E.D.Ark.1988).

On appeal from that decision, we affirmed the district court's holding that the error did not warrant reversal of the convictions because "[t]he evidence of petitioners' guilt, even without Vicki Lehman's testimony, is overwhelming." *Orndorff*, 906 F.2d at 1233. We remanded the case, however, with directions for the district court to reconsider the question whether the error was harmless with respect to the petitioners' death sentences. *Id.* On remand, the district court found the error harmless and denied petitioners' request for habeas relief. Petitioners appeal from that decision.

## II.

■ We begin with the premise that when reviewing a constitutional violation for harmless error, courts traditionally required "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705

---

1. In Arkansas, a person convicted of capital murder may receive the death penalty or life imprisonment without parole. Ark.Code Ann. § 5–10–110 (1987) ("A person commits capital murder if ... he commits ... robbery ... and in furtherance of the felony ... he or an accomplice causes the death of any person under circum-

stances manifesting extreme indifference to the value of human life.").

2. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI.

(1967). The Supreme Court has recently altered this premise, holding that the correct harmless error standard in most habeas corpus cases is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamsom,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776; 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).[3] This court has recently noted the question whether the *Brecht* standard applies if the state courts never considered the harmless error issue because they found no error. *Hoversten v. Iowa,* 998 F.2d 614; No. 92–2402 (8th Cir.1993). In *Hoversten,* however, this court declined to answer that question because the error was not harmless under either standard. *Id.* 998 F.2d at 617. We now reach the unresolved question.

*Brecht* reached the Supreme Court after two state appellate courts, a federal district court, and a federal court of appeals had reviewed the error under the *Chapman* harmless error standard. Petitioners argue that the Court declined to apply the *Chapman* harmless error standard on collateral review because to do so would undermine "the finality of convictions that have survived direct review within the state court system." *Brecht,* — U.S. at —, 113 S.Ct. at 1720 (citations omitted). The Court noted that "[s]tate courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process under *Chapman,*" and that "it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that *Chapman* requires state courts to engage in on direct review." *Id.* at —, 113 S.Ct. at 1721.

We believe the *Brecht* rule is based largely on the notion that because the state courts can properly apply the *Chapman* harmless error standard on direct review, the federal habeas courts need only review those decisions under the *Kotteakos* harmless error standard. In the case before us, however,

the state courts did not have the opportunity to review the error at all, and the federal habeas court was the first court to review the constitutional error under the *Chapman* harmless error standard. As a result, we find that rule announced in *Brecht* does not apply and that the *Chapman* harmless error standard is the appropriate test in this case.

■ We therefore must determine whether the error in this case "was harmless beyond a reasonable doubt." *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828. More specifically, in the context of this confrontation clause violation, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (listing five factors a reviewing court should evaluate in making its decision).

In remanding this case, we instructed the district court to conduct its inquiry using the harmless error analysis set forth in *Van Arsdall.* We noted that the court should compare the pre-hypnotic statements to the trial testimony "with an eye toward sorting out those things about which Vicki Lehman could testify without the aid of hypnosis (that is, from actual memory) from those things about which she could testify only after being hypnotized." *Orndorff,* 906 F.2d at 1232. We further stated that "[u]nless this sorting process reveals significant differences, the error should be deemed harmless." *Id.* (footnote omitted). The district court found there to be a "remarkable consistency" in Vicki Lehman's recitations of the murder-robbery and therefore concluded the error was harmless.

After the district court made its ruling on remand, the Supreme Court decided *Yates v. Evatt,* — U.S. —, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991). Petitioners argue that *Yates* changes the legal test announced in *Van Arsdall* and therefore the case must be remanded because the district court's legal

---

**3.** After this case was argued and submitted, the Supreme Court decided *Brecht.* At this court's

request, the parties filed supplemental briefs discussing the effect *Brecht* may have on this case.

analysis is flawed.[4] Respondent Lockhart argues that *Yates* deals with harmless error in the context of an improper presumption and therefore is not relevant to this confrontation clause harmless error analysis. We find that *Yates* is consistent with *Van Arsdall* and does not require us to remand.

■ In *Yates*, it was determined that the trial court's jury instructions created certain presumptions which improperly shifted the burden of proof from the prosecution to the defendant. In analyzing the question whether this unconstitutional burden-shifting jury instruction was harmless, the Court employed a two-step approach. In essence, a reviewing court must first establish "what evidence the jury actually considered in reaching its verdict." —— U.S. at ——, 111 S.Ct. at 1893. The purpose of this first step is to determine what evidence may have been considered as tending to prove the improperly presumed fact. The second step is to "weigh the probative force of that evidence [determined in the first step] as against the probative force of the presumption standing alone." *Id.* The Court concluded that the proper test is "whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." *Id.*

Petitioners argue that the methodology used in *Yates* should be "extrapolated" to the present harmless error analysis of this confrontation clause violation. They argue that *Yates* requires a reviewing court to first determine what evidence the jury considered on the issue of the death sentence. According to petitioners, the court must then determine if there are any differences in the pre- and post-hypnotic testimony of Vicki Lehman, and finally determine whether the verdict of death actually rested on the hypnotically enhanced testimony. We agree with petitioners that *Yates* is instructive of our analysis, but we do not agree that *Yates* changes the *Van Arsdall* analysis.

In analyzing a violation of the confrontation clause for harmless error, the Court in *Van Arsdall* stated that:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradicting testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

475 U.S. at 684, 106 S.Ct. at 1438. The fifth factor described in *Van Arsdall* (the overall strength of the prosecution's case) requires us to examine the evidence presented by the prosecution which the jury may have considered in deciding to impose the death sentence. In *Lufkins v. Leapley,* 965 F.2d 1477 (8th Cir.1992), we analyzed a confrontation clause violation for harmless error and cited *Yates* for the proposition that "to determine whether the [error] was harmless beyond a reasonable doubt, we must examine the other evidence introduced at trial and determine whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Id.* at 1481.

■ In sum, our analysis under *Yates*, *Van Arsdall*, and *Lufkins* must proceed as follows. We must first compare the pre- and post-hypnotic statements to determine if any "significant differences" exist. If no significant differences are found, the error is deemed to be harmless. If, however, significant differences do exist, we must determine if the variations nevertheless are harmless. To accomplish that task, we assume that Vicki Lehman had been cross-examined about the hypnosis, and we also assume that the damaging potential of that cross-examination was fully realized. *See Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438. That is, we assume the jury was made aware of any

---

**4.** After *Yates* was decided, petitioners requested the district court to reconsider its decision. The district court denied this request stating, "The Court will not resolve this question because it is a matter for the Court of Appeals." *Orndorff v. Lockhart,* —— U.S. ——, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991) (order denying motions for new trial or hearing).

changes in Vicki Lehman's story after the hypnosis, as well as the possibility of "confabulation," "suggestibility," and "memory-hardening" that is associated with hypnosis.[5] After making these assumptions, we must determine if we can still say that the error was harmless beyond a reasonable doubt. To determine whether the defendants' inability to cross-examine Vicki Lehman about the hypnosis did not contribute to the jury's imposition of the death penalty, we must examine the evidence introduced at trial which supported the verdict, as well as the other factors listed in *Van Arsdall.*

### III.

■ We review the district court's harmless error analysis de novo, as a mixed question of law and fact. *See, e.g., Gunn v. Newsome,* 881 F.2d 949, 964 (11th Cir.1989) (en banc); *Graham v. Wilson,* 828 F.2d 656, 659–60 (10th Cir.1987). We therefore begin our analysis, as did the district court, with a comparison of Vicki Lehman's pre- and post-hypnotic statements. On appeal, petitioners claim Vicki Lehman made 134 post-hypnotic statements which contain significant variations from her two pre-hypnotic statements. They contend 83 of the statements are "new" and 51 of the statements are "changed" from her pre-hypnotic statements.[6]

Petitioners emphatically claim that Vicki Lehman has been inconsistent in remembering the number of guns she saw.[7] Petitioners argue that Vicki's pre-hypnotic statements indicate that at different times she saw either two or three guns, while at trial she testified that all four petitioners had guns.

Vicki Lehman has stated that she remembered seeing the petitioners with guns at two distinct times during the robbery. The first instance was immediately after the petitioners forced their way into the house. Vicki stated in her second pre-hypnotic statement that when the intruders forced their way in

the door, three of the men pointed their guns at her for an instant while the fourth man attacked her father. Of those three men with guns, one then turned to the fight with her father, the tallest man grabbed her and held her at gunpoint, and the smallest man stood nearby with his gun. In her first statement, Vicki stated that two men immediately began wrestling with her father and the other two had their guns on her. In any event, Vicki has never wavered from her statement that petitioner Richley, the tallest man, had a gun. She saw the gun pointed at her and felt it pressed to her head and back throughout most of the ordeal. In addition, she has stated twice (once in the first pre-hypnotic statement and once in the second) that petitioner Orndorff, the smallest man, had a gun when he first entered the house.

The second instance Vicki remembered seeing guns was later that night when all four petitioners were with her in the kitchen. She recounted this event consistently in both of her pre-hypnosis statements. Vicki was taken to the kitchen from her parents' bedroom to call an ambulance, but petitioner Clines intervened and ripped the phone from the wall. Moments later, three of the petitioners stood in front of her with their guns. At trial, Vicki testified that she believed at that moment all four men had guns in their hands, one at her back and three in front of her. She testified later on cross-examination, however, that it was possible that there were only two guns pointed at her, but "it seem[ed] like" there were three guns in front of her.

In sorting through these statements, we conclude, as did the district court, that there is no material or significant difference between Vicki Lehman's pre- and post-hypnotic statements concerning the number of guns involved in this crime. She indicated before and after hypnosis that at least three of the

---

5. The dangers associated with using hypnotically-enhanced testimony in a criminal trial are discussed in some detail in *Little v. Armontrout,* 835 F.2d 1240, 1243 (8th Cir.1988) (en banc) (citing *Rock v. Arkansas,* 483 U.S. 44, 58–60, 107 S.Ct. 2704, 2712–14, 97 L.Ed.2d 37 (1987)).

6. We refer to these statements as "New Statements Nos. 1–83" and "Changed Statements Nos. 1–51" as they are numbered in petitioners' briefs.

7. This claim is made in Changed Statement No. 1.

petitioners, and possibly all four, carried guns.

Petitioners argue that Vicki Lehman's pre-hypnotic statements indicate that only three of the petitioners were in the bedroom at the time Don Lehman was murdered, but that her trial testimony places all four in the bedroom when the shots were fired.[8] In her first pre-hypnotic statement, Vicki clearly indicated that the tallest man, Richley, stayed with her in the hall while the others were in the bedroom. In her second pre-hypnotic statement, however, Vicki was less sure that the tall man stayed with her. She indicated that she had her head down on the floor and that he could have gone into the bedroom with the others. Moreover, her second pre-hypnotic statement indicates that she was not positive that the man who originally grabbed her was the same man that grabbed her after the shots were fired. At trial, Vicki admitted on cross-examination that it was possible that not all of the petitioners were in the bedroom at the time she heard the shots fired.

Perhaps the most dramatic addition to Vicki Lehman's pre-hypnotic statements is her trial testimony about the behavior of petitioner Orndorff while inside the house.[9] At trial, she described Orndorff as "wirey acting" and "squirrely-acting." She testified that Orndorff liked to play with the little toys located on a bar in the main room and specifically testified that he liked to pull down the lever on the toy slot machine. There is no mention of this behavior in her pre-hypnotic statements. She also stated that "this little guy, the guy who was darting around all night, he kind of ran through there and swung on a chandelier and screamed real loud like he was happy or something." This incident allegedly occurred within minutes of Don Lehman's murder as Vicki was being taken into the kitchen to use the phone. The only pre-hypnosis mention of Orndorff's behavior in this regard was in response to a question by the police about the broken glass in the dining room. Vicki replied, "This hap-

pened later right before they left. He [referring to Orndorff] just went through there and grabbed it....." At trial Vicki also described an incident that occurred in her parents' bedroom while her father lay dying on the bed. She stated that the

> smaller guy was kind of kicking around through the—through the clothes ... and somebody commented that they'd better get out of there, that the neighbors had probably heard the guns and the smallest guy looked out the window. I can remember seeing him look out the window and he said something, I'm not real sure what he said, something about, 'The neighbors will see us,' or something.

This incident is not mentioned in either of the pre-hypnotic statements.

Petitioners also claim that Vicki Lehman changed her statements regarding petitioner Holmes' involvement. At trial, Vicki testified that after the phone was ripped off the wall, all four petitioners were with her in the kitchen "and they said, 'Where's any more money or where's some jewelry.' I can remember the big guy going, 'Guns. Guns. We know you have guns.'"[10] Petitioners claim this testimony is significantly different from her first pre-hypnotic statement in which she indicated that all three petitioners standing in front of her at that time demanded the guns, and from her second pre-hypnotic statement in which she said that the unmasked man, petitioner Clines, demanded the guns. Although her trial testimony is inconsistent with her second pre-hypnotic statement, it is not significantly different from her first pre-hypnotic statement in which she indicated that petitioner Holmes was one of the three men standing in front of her demanding guns.

At trial, Vicki testified that petitioner Holmes was the first one on her father when the petitioners forced their way through the door.[11] Petitioners claim this is a significant change from her pre-hypnotic statements. In both the pre-hypnotic statements, however, petitioners Holmes and Clines were im-

---

**8.** New Statements Nos. 28 and 29.

**9.** New Statements Nos. 31–36, 40, 41, 80 and 81 and Changed Statements Nos. 20 and 38.

**10.** Changed Statement No. 44.

**11.** Changed Statement No. 2.

mediately on her father as soon as the door opened and petitioners Richley and Orndorff stayed by her. The fact that at trial Vicki identified Holmes as being the first of two attackers who immediately pounced on her father is insignificant.

Some of the statements identified by the petitioners are not of any real consequence to the jury's determination of the sentence for various reasons. Some deal with events before the intruders broke into the house [12] or after the intruders left.[13] Several of the statements contain physical descriptions of the intruders [14] and, in particular, their shoes.[15] Others are descriptions of events that occurred during the robbery and are simply not new or changed.[16]

■ We can describe the remaining new or changed statements as adding detail, color, vividness, and perhaps credibility to Vicki Lehman's pre-hypnotic statements. Some of these statements describe in greater detail what occurred immediately after the petitioners forced their way into the house.[17] Others add detail to the actual fight that ensued.[18] These latter details are indeed new statements because Vicki's pre-hypnotic statements indicated that she only "sensed" that the fight had moved into the bedroom. At trial she described her father getting away from the petitioners and being chased down the hall. Many of the statements describe various details as she walked from room to room with the intruders.[19] Several statements deal with Vicki's own thought processes or feelings during the robbery.[20] Other statements describe her mother's actions.[21] When viewed as a whole, these variations may have enhanced Vicki Lehman's credibility and therefore could have affected the jury's decision. However, as we noted in our prior decision, the "error is not harmful sim-

ply because the jury might have found her testimony less credible had defense counsel been able to probe the issue of her hypnosis on cross-examination." *Orndorff*, 906 F.2d at 1232.

The district court found that no significant differences existed between the pre- and post-hypnotic statements and therefore determined the error to be harmless without discussing the analysis set forth in *Van Arsdall*. We believe there to be enough variation, however, to warrant an examination of the differences in light of the *Van Arsdall* factors and we may make our own harmless error determination without remanding to the district court. *See Yates*, —— U.S. at ——, 111 S.Ct. at 1895 ("Although our usual practice in cases like these is to reverse and remand for a new determination under the correct standard, we have the authority to make our own assessment of the harmlessness of a constitutional error in the first instance."); *see also Lufkins*, 965 F.2d at 1481 (holding that in certain circumstances, a reviewing court may conduct a harmless error analysis sua sponte).

The first four factors described in *Van Arsdall* clearly weigh in favor of petitioners. First, Vicki Lehman's trial testimony was very important to the prosecution's case; the prosecutor repeatedly said so to the jury. *See Orndorff*, 707 F.Supp. at 1068. Second, her testimony was certainly not cumulative since she was the only occurrence witness, other than her mother who saw and remembered very little, to testify for the state. Third, the only person to either corroborate or contradict her testimony on any material issues was petitioner Holmes. And fourth, the defense attorneys understandably cross-examined Vicki rather gingerly about any

---

12. New Statements Nos. 63–66 and 83.

13. New Statements Nos. 49–62 and Changed Statements Nos. 45 and 46.

14. New Statements Nos. 37–39.

15. Changed Statements Nos. 13, 14 and 47–50.

16. New Statement No. 30 and Changed Statements Nos. 32–37 and 42.

17. New Statements Nos. 1–12, 71–73, 78 and 79 and Changed Statements Nos. 3–8 and 15.

18. New Statements Nos. 13–23.

19. New Statements Nos. 42–48, 67, 69, 70, 74–77 and 82 and Changed Statements Nos. 9–12, 16–19, 21–26, 30, 31, 39, 41, 43 and 51.

20. New Statements Nos. 24–27 and 68.

21. Changed Statements Nos. 27–29 and 40.

variations that they discovered in her trial testimony.

This brings us to our discussion of the fifth factor, the overall strength of the prosecution's case. Petitioners argue that they are entitled to an individualized evaluation and we agree. In this case, the prosecution's case against each defendant for the death penalty was different and we believe *Yates* and *Van Arsdall* require us to evaluate the case against each petitioner individually. For each petitioner, we will consider the variations in Vicki Lehman's testimony (that is, those things about which she could testify only after hypnosis) together with the evidence of aggravating and mitigating circumstances, and determine if we can nonetheless say that the error was harmless beyond a reasonable doubt.

■ We find the prosecution's case against petitioner Richley for imposition of the death penalty was strong. The jury found that all three applicable statutory aggravating circumstances existed [22] and that no mitigating circumstances existed. Vicki Lehman consistently described him as the leader of the group, and consistently stated that he threatened to kill her. At the penalty phase of the trial, the prosecution presented evidence that Richley had planned and executed a series of armed robberies in the months prior to the Lehman murder. The only variation in Vicki Lehman's statements which may have affected Richley's sentence was her testimony that all four petitioners were in the bedroom when the shots were fired. Although Vicki's first pre-hypnotic statement indicated that Richley was not in the room at the time the shots were fired, her second pre-hypnotic statement indicated that Richley could have been in the room. We can say, however, beyond a reasonable doubt that the error in

this case did not contribute to petitioner Richley's death sentence.

■ We find that the prosecution's case against petitioner Holmes for imposition of the death penalty was strong. More importantly, we find that few if any of the variations in Vicki Lehman's statements were material to the prosecution's case against Holmes. The variations concerning Holmes involved Vicki stating that Holmes was the first man on her father and that Holmes was demanding the guns. As we discussed above, these statements are not really variations at all, and to the extent they are different, the differences are insignificant. The prosecution presented evidence which linked Holmes to several of the robberies allegedly committed by Richley. The jury found that all three statutory aggravating circumstances existed, and that no mitigating circumstances existed. The error in this case did not contribute to petitioner Holmes' death sentence beyond a reasonable doubt.

■ We also find that the prosecution's case against petitioner Clines for imposition of the death penalty was strong and that few if any of the variations in Vicki Lehman's testimony were material to the prosecution's case against Clines. Vicki's pre-hypnotic statements consistently identified Clines as one of the two men immediately upon her father and consistently placed him in the bedroom at the time of the murder. Moreover, Vicki consistently described Clines as the man who ripped the phone from the wall and prevented her from calling an ambulance for her father. The jury found all three aggravating circumstances existed and unanimously found that mitigating circumstances did exist by virtue of Clines' electrocution [23] and his excessive drinking. One or more of the jurors found that Clines suffered from a

**22.** The jury was given a verdict form which listed the following three aggravating circumstances: "1. [Petitioner] previously committed another felony an element of which was the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another person." *See* Ark.Code Ann. § 5–4–604(3) (1987). "2. In the commission of the capital murder, [petitioner] knowingly created a great risk of death to a person other than the victim." *See id.* § 5–4–604(4). And, "3. The

capital murder was committed for pecuniary gain." *See id.* § 5–4–604(6).

**23.** In 1979, Clines was accidentally electrocuted while at work. At the penalty phase of the trial, evidence was submitted that Clines began drinking excessively and experienced a drastic personality change as a result of the accident. The prosecution also presented evidence that even before the accident, Clines drank excessively and had been convicted of robbery.

personality change after the electrocution. Because there are no significant variations in Vicki Lehman's testimony which may have affected the jury's decision to sentence Clines to death, we can say beyond a reasonable doubt that the error in this case did not contribute to petitioner Richley's death sentence.

■ We find that the prosecution's case against petitioner Orndorff for imposition of the death penalty was the weakest in this case. We also find that the variations in Vicki Lehman's testimony about Orndorff's behavior were the most significant. The jury found that only two of the three aggravating circumstances existed (the jury did not find that Orndorff created a great risk of death to a person other than the victim) and one or more of the jurors found that two mitigating circumstances existed (that Orndorff was acting under unusual pressures or influences or under the domination of another person and that Orndorff was an accomplice and his participation was relatively minor). We cannot say beyond a reasonable doubt that the variations in Vicki Lehman's testimony did not contribute to the jury's decision to sentence Orndorff to death. Without Vicki Lehman's descriptions of Orndorff playing with toys, swinging from the chandelier, and looking out the window for the neighbors, the jury may have sentenced Orndorff to life imprisonment rather than death.

We therefore affirm the district court's denial of habeas relief to petitioners Richley, Holmes, and Clines. We reverse the denial of habeas relief to petitioner Orndorff and, in accordance with our previous decision, *Orndorff*, 906 F.2d at 1233, we remand the case to the district court with instructions that the court's order granting habeas relief should give the state the option of conducting a new sentencing proceeding or reducing the sentence to life without parole.

RICHARD S. ARNOLD, Chief Judge, concurring in part and dissenting in part.

For the reasons given by the Court, I concur in reversing the denial of habeas corpus relief to Michael Ray Orndorff. I concur also in denying this relief to Hoyt Franklyn Clines and James William Holmes. As to the imposition of the death penalty on Darryl V. Richley, however, I respectfully dissent. I would grant Richley the requested relief because the constitutional error—the denial of the chance to cross-examine Vicki Lehman about her hypnosis—was not harmless beyond a reasonable doubt. I disagree also with the Court's holding that our prior ruling in *Orndorff v. Lockhart*, 906 F.2d 1230 (8th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991), prevents us from considering the actual effect of the hypnosis on the credibility of the hypnotized witness.

### I.

As the Court has explained, using in a criminal prosecution the testimony of a previously hypnotized witness, even when the defendants were not given the chance to cross-examine the witness about the hypnosis, does not require automatic reversal. Rather, the Confrontation Clause error, the use of this testimony, is subject to a harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *Lufkins v. Leapley*, 965 F.2d 1477, 1480–81 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 271, 121 L.Ed.2d 200 (1992); see also *Williams v. Armontrout*, 877 F.2d 1376, 1379–81 (8th Cir.1989), *cert. denied*, 493 U.S. 1082, 110 S.Ct. 1140, 107 L.Ed.2d 1044 (1990) (due-process claim). The Court must find the error to be harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). *Van Arsdall* provides a list of five factors to be considered in analyzing the harmfulness of Confrontation Clause errors. *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. Before applying the *Van Arsdall* criteria to Richley's claim, however, I first consider this Court's interpretation of the holding of our earlier decision in this case, *Orndorff v. Lockhart, supra*.[1]

---

1. Although in *Orndorff* the Court did not decide whether there was a violation of the Confrontation Clause, it was not necessary for it to do so.

This was not in issue because the State already had conceded that the use of Lehman's testimony, without disclosure that she had been hypno-

In that decision, we said that the Confrontation Clause error—the deprivation of the chance to cross-examine Lehman about her hypnosis—"is not harmful simply because the jury might have found her testimony less credible had defense counsel been able to probe the issue of her hypnosis on cross-examination." *Orndorff*, 906 F.2d at 1232. The Court today evidently infers from this that, even if Lehman's testimony after hypnosis differed from or was more detailed than statements she made beforehand, we may not consider, in our harmless-error analysis, those discrepancies and additions serving only to enhance the credibility of her testimony.

I do not read *Orndorff*'s holding as broadly as the Court does. *Orndorff* held that the mere possibility that hypnosis may have affected Lehman's testimony by rendering it more convincing did not in and of itself mean that the error was harmful. In that case, we vacated the lower court's holding that the 137 variations between Lehman's pre-hypnosis and post-hypnosis statements were " 'inherently prejudicial.' " *Orndorff*, 906 F.2d at 1232 (quoting *Orndorff*, 707 F.Supp. 1062, 1069 (E.D.Ark.1988)).[2] Instead, we required the District Court to analyze these variations. *Orndorff*, 906 F.2d at 1232. Thus, *Orndorff* does not require exclusion from our harmless-error analysis of the color, detail, and vividness that Lehman's post-hypnosis testimony added to her previous statements; it mandates evaluation of the effect of the specific changes and additions on the overall testimony, including, in my view, its credibility.

To read *Orndorff* as disallowing consideration of credibility evidence in determining whether the denial of the right to confront the witness was harmful would conflict with *Delaware v. Van Arsdall*, 475 U.S. 673, 106

S.Ct. 1431, 89 L.Ed.2d 674 (1986). *Van Arsdall*, like this case, concerned the credibility of testimony. In 'that case, the Supreme Court addressed whether it was harmful error to prevent the defendant from cross-examining the government's witness about an unrelated criminal charge against him. *Id.* at 676, 679, 106 S.Ct. at 1433, 1435. The government had dropped that charge in exchange for his agreement to talk with the prosecutor about Van Arsdall, potentially biasing the witness's testimony. *Id.* at 676, 684, 106 S.Ct. at 1433, 1438. In *Van Arsdall*, as here, the prosecution was allowed "to introduce evidence that was not subject to constitutionally adequate cross-examination." *Id.* at 684, 106 S.Ct. at 1438. In both *Van Arsdall* and this case, the prohibited cross-examination might have enabled the defendants to "cast doubt on the testimony of an adverse witness." *Id.* And, here, as in *Van Arsdall*, "the reviewing court should be able to decide whether the not-fully-impeached evidence might have affected the reliability of the factfinding process at trial." *Id.*

Our task is to decide whether the error is harmless beyond a reasonable doubt. It must be harmless even "assuming the damaging potential of the cross-examination were fully realized." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. To make this determination, we must consider the impact that the denied cross-examination would have had on Lehman's testimony, including its credibility. Cross-examination of Lehman about the effects of the hypnosis on her recollections might have prompted the jury to disregard those parts of her testimony relying upon new memories that arose after hypnosis. See *Orndorff*, 707 F.Supp. at 1070. Thus, we must be able to consider the color, vividness, and detail added to the post-hypnosis testi-

tized, was a constitutional error. *Orndorff*, 906 F.2d at 1232.

**2.** The District Court stated that "[a]ll of the instances where Ms. Lehman's trial testimony differed from or added to her previous statements need not be discussed because the court finds that the prosecutor's failure to disclose [the hypnosis] was inherently prejudicial." *Orndorff v. Lockhart*, 707 F.Supp. 1062, 1069 (E.D.Ark. 1988). The reason for this holding was the effect of hypnosis on trial testimony. Hypnosis has

been known to enhance a witness's confidence in her testimony, whether true or imagined, once she has recited it under hypnosis. *Id.* This tends to make the testimony more convincing to the factfinder, *id.*, and is known as "memory-hardening." *Williams v. Armontrout*, 877 F.2d 1376, 1380 (8th Cir.1989). It is also important to scrutinize the particular effects of the post-hypnosis testimony because hypnosis causes not only memory-hardening, but also the creation of imaginary memories. *Id.*

mony (which may have been the product of memory-enhancement techniques). Although our earlier opinion does not allow us to presume that the many additions to Lehman's statements in the post-hypnosis testimony necessarily render the error harmful, it permits us to consider how the detail, color, and vividness affected both the substance and credibility of Lehman's testimony in this particular case. As the Court recognizes, those details which go to the behavior and attitude of the petitioners during the crime could have persuaded the jury to impose the death penalty.

Because I interpret *Orndorff* to permit the evaluation of the effect of specific changed or added statements that add detail on the witness's testimony, including its credibility, I would analyze under the *Van Arsdall* factors the testimony that the Court declines to consider. See *ante* at nn. 11–20, at 1433–34. I have therefore done so in reviewing Richley's claim.[3]

### II.

In my view, the denial of the chance to cross-examine Lehman about her hypnosis was not harmless beyond a reasonable doubt with respect to the imposition of the death penalty on Richley. I discuss the points on which the Court and I agree before turning to how I would apply the *Van Arsdall* case's fifth factor to Richley.

I agree with the Court's analysis of the first four *Van Arsdall* factors.[4] I also agree

that we must consider the fifth *Van Arsdall* factor—the overall strength of the prosecution's case—as to each defendant individually.[5] I further agree that we must determine the effect of the error on the factfinding process at trial, *Van Arsdall*, 475 U.S. at 681, 106 S.Ct. at 1436, that is, on the sentence obtained, see *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828 (applying harmless-error analysis to the "verdict obtained"). To do this here, we must compare the overall strength of the prosecution's case for the death penalty with and without the hypnotically enhanced testimony. That is, "we must examine the other evidence introduced at the trial" to determine whether it affected the sentence imposed. *Lufkins v. Leapley*, 965 F.2d at 1481 (citing *Yates v. Evatt*, —— U.S. at ——, 111 S.Ct. at 1892). Although I agree with the Court's statement of the law, I disagree with its application of *Van Arsdall*'s fifth factor in this case.

Richley first argues that Lehman's post-hypnosis testimony drastically altered the jurors' perception of his role in the death of her father. At trial, she testified that Richley left her while the shots were fired, suggesting that he was in the bedroom when her father was killed. New Statements 28 and 29, at App. 86–87. The State argues correctly that in her second pre-hypnosis statement, she said that she did not know if Richley had stayed with her during the shooting. App. 48, 50. But neither did she know whether he had left—only that he "wasn't touching" her then. App. 48. Moreover, she said very

---

**3.** I have also considered this sort of testimony in reviewing the claims of Holmes and Clines. Specifically, I have evaluated the additions to testimony that made Lehman's account more detailed, and those that, by describing her feelings and thoughts during the crime, enhanced both her credibility and the horror of the crime. For example, I have considered Lehman's new trial testimony that she remembered feeling like she needed to calm down and regulate her breathing, and that she recalled "crunching up" when she heard the gunshots. New Statements 24–27. Although such statements are legally material under *Orndorff*, they make no difference as to Holmes and Clines. I believe the jury would have imposed the death sentence on them even without these additions to the testimony.

**4.** However, I would emphasize them more than the Court does. Lehman's testimony undoubted-

ly influenced the severity of Richley's punishment because that testimony was almost the only testimony about Richley's behavior during the crime and his treatment of her and her family.

**5.** I also agree with the Court's rejection of petitioner's argument that *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991), *overruled on other grounds, Estelle v. McGuire*, —— U.S. ——, —— n. 4, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991), alters the harmless-error analysis in this case. *Yates* is consistent with the *Van Arsdall* test, particularly as an amplification of its fifth factor. *Yates* required a comparison of the probative force of the evidence the jury considered with the effect of the erroneous presumption given in the jury instructions. *Id.* —— U.S. at ——, 111 S.Ct. at 1893.

clearly in her first pre-hypnosis statement that Richley stayed with her during the shooting. App. 17–18, 19, 36. She said that the three other petitioners were in the bedroom, App. 33–34, that Richley was not, and that he "had ahold of me the whole time." App. 34.[6] At trial, she bolstered her testimony that Richley had left her during the shooting and then came back; she described her remembrance of Richley's heavy walk and his boots upon his return. Changed Statements 13, 14, 47, and 48, at App. 87–88, 160–61. But before her hypnosis she had said that she did not see Richley's feet. App. 23. The placement of Richley by her side during the shooting is key to his defense, particularly since he had said that he did not want to be part of a murder and he wanted to let Lehman call an ambulance for her father. App. 38, 54. This change in testimony, increasing the likelihood that the jurors would think that Richley was in the bedroom during the shooting, may well have strongly influenced the jurors in selecting his sentence. In my view, this change was not harmless beyond a reasonable doubt.

Other post-hypnosis statements may have influenced the jury to impose the death penalty because they portrayed Richley as a leader, controlling Lehman and the other men. *E.g.*, New Statements 3 and 9 (Lehman addressing specifically Richley in asking what the intruders wanted); New Statement 7 (asking Lehman who else was home); New Statements 10, 11, 71, 73, 78, and 79 (noting his reactions to the fight and directing Orndorff to go help in the fight); Changed Statement 18 (telling Lehman to hand her Christmas money to Orndorff); New Statement 68 (recalling feeling that if she kept talking and searching for money, Richley might not shoot her). Juxtaposition of these post-hypnosis statements with the post-hypnosis placement of Richley in the bedroom at the time of the murder could also have influenced the jury in sentencing Richley to death.

It is true that Lehman's pre-hypnosis statements also showed Richley to be violent and a leader. *E.g.*, App. 16 (telling Lehman to shut up); App. 18, 45 (leading her by her

hair); App. 21 (pushing her hard, pushing gun against her head); App. 37 (Lehman stating that if anyone was the leader, it was probably Richley); App. 45–46 (carrying a gun). I still believe, however, that Lehman's trial testimony about Richley's location during the murder was very likely a decisive consideration in his sentencing (particularly since some of the jurors would have found his participation in the murder to be relatively minor and that of an accomplice, App. 257). Lehman's post-hypnosis trial testimony was vital to the prosecution's case for the death penalty and unique among the other testimony because of its detailed description of Richley's behavior and attitude while committing the crime. In my view, this testimony enhanced the strength of the prosecution's case for the death penalty and therefore is harmful, and reversible, error.

---

6. At trial, she no longer recalled saying this. App. 191–92. Although this may be a normal

memory lapse, it may well be attributable to the hypnosis.