No. 88–7629. VICKERS *v.* ARIZONA. Sup. Ct. Ariz. Certiorari denied.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting), I would grant the petition for certiorari and vacate the death penalty in this case. Even if I did not hold this view, I would grant the petition to decide whether the Constitution requires a State to provide an indigent defendant access to diagnostic testing necessary to prepare an effective defense based on his mental condition, when the defendant demonstrates that his sanity at the time of the offense will be a significant issue at trial. I believe that our decision in *Ake* v. *Oklahoma*, 470 U. S. 68 (1985), compels us to answer that question in the affirmative.

Petitioner Robert Wayne Vickers was convicted of murdering a prison inmate and sentenced to death. His only defense at trial was insanity. Specifically, Vickers claimed that he suffered from temporal lobe epilepsy, a brain disorder that can cause violent behavior and render a person unable to appreciate the nature and wrongfulness of his acts. Vickers' court-appointed psychiatrist, Dr. Paul Bindelglas, determined, after a lengthy interview and an exhaustive review of Vickers' medical records, that Vickers suffered from "definite dissociative reactions" possibly due to temporal lobe epilepsy. App. to Pet. for Cert. B–7. Dr. Bindelglas based his opinion on Vickers' history of cerebral trauma and seizures, neurological deficits reported by a psychologist when Vickers was a child, improvement in Vickers' condition when he was placed on anti-convulsive and psychotropic medications and

reversion when he was taken off the medication, and an abnormal electroencephalogram (EEG) performed four years before the murder. *Ibid.* Dr. Bindelglas further opined that Vickers probably was in a dissociative state at the time of the offense, which made him "incapable of rendering any judgement and . . . unable to know right from wrong." *Id.*, at B–9. Dr. Bindelglas stated that he could not make a definitive diagnosis, however, without certain neuropsychological testing. *Ibid.*

Based on Dr. Bindelglas' recommendation, petitioner requested that the trial court provide access to diagnostic testing. Petitioner included with his request an affidavit from a second psychiatrist, Dr. David Bear, who, after reviewing petitioner's records and examining him for five hours, agreed that there was a "substantial possibility" that Vickers suffered from temporal lobe epilepsy, which may have impaired his ability to "appreciate the quality and nature of the act and its wrongfulness." *Id.*, at C–4, C–9. Dr. Bear also stated that diagnostic testing, including a careful neurological examination and multiple EEG's, was necessary "before professional judgment can be rendered regarding Mr. Vickers' mental state at the time of the subject offense." *Id.*, at C–12. In addition, the State's own expert, Dr. Maier Tuchler, testified at petitioner's competency hearing that diagnostic testing was necessary to determine definitely whether Vickers suffered from temporal lobe epilepsy. Finally, petitioner supplied the court with the affidavits of two other psychiatrists who testified that strong evidence indicated that Vickers suffered from a mental disorder which impaired his capacity to make rational judgments, but that diagnostic testing was necessary before a firm conclusion could be reached. App. to Pet. for Cert. D and E.

Despite the consensus of these medical experts that diagnostic testing was necessary, the court denied petitioner's request. The court relied on a two-paragraph letter from a psychiatrist appointed at the State's request, Dr. William Masland. Dr. Masland concluded, on the basis of a quick review of petitioner's medical records, conversations with prisoners and prison staff, and a brief interview with Vickers, that "there is absolutely nothing to suggest that this man is epileptic" and that "further diagnostic testing . . . would be totally superfluous." *Id.*, at F. The court refused to reconsider its order after receiving additional affidavits from Dr. Bindelglas and Dr. Bear and two neurologists

that vehemently contested Dr. Masland's opinion and reemphasized the need for diagnostic testing.

Because of the lack of diagnostic testing, Dr. Bindelglas could testify at trial only that there was a "definite probability" of temporal lobe epilepsy. 159 Ariz. 532, 536, 768 P. 2d 1177, 1181 (1989). Before sentencing, petitioner again requested diagnostic testing to establish the brain disorder as a mitigating circumstance; again the court denied his motion.

The Arizona Supreme Court rejected petitioner's argument that the State violated due process by denying him an adequate opportunity to prove his insanity defense. *Ibid.* The court reasoned that the requested testing would have been expensive and would have posed a "burdensome security problem." *Id.*, at 537, 768 P. 2d, at 1182. The court also claimed that nothing indicated that testing would have helped petitioner prove his insanity defense. *Ibid.*

In *Ake* v. *Oklahoma, supra,* at 83, this Court held that when an indigent "defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a *competent* psychiatrist who will conduct an *appropriate* examination and assist in evaluation, preparation, and presentation of the defense." (Emphases added.) The right to a competent psychiatrist necessarily includes the right to have the State provide the psychiatrist with the tools he requires to conduct an adequate examination and evaluation of the defendant. To hold otherwise is analogous to requiring the State to provide an indigent defendant with an attorney, but not requiring it to pay for the attorney's legal research expenses.

This is not to say that an indigent defendant is entitled to every scientific procedure that has only a remote possibility of bolstering his defense. Thus, we recognized in *Ake* that "the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy." 470 U. S., at 77 (citing *Ross* v. *Moffitt,* 417 U. S. 600 (1974)). But when a defendant demonstrates that his sanity will be a significant issue at trial, and his psychiatrist makes a plausible showing that certain testing is necessary for him to perform his *Ake* function, that testing must be considered one of "the raw materials integral to the building of an effective defense" that the State must provide. 470 U. S., at 77.

Petitioner undoubtedly satisfied the threshold requirements. First, his sanity was a significant factor in his defense. Vickers' "sole defense was that of insanity," *id.*, at 86, and six experts testified that there was a substantial possibility that Vickers suffered from a mental disorder at the time of the offense that might have impaired his capacity to understand the nature of his actions. Indeed, the trial court's appointment of Dr. Bindelglas itself shows that petitioner's sanity was a significant issue. Second, Vickers' court-appointed psychiatrist established that testing was necessary for him to perform his *Ake* role adequately. Dr. Bindelglas stated in the clearest terms that he could not make a definitive diagnosis without specific testing. App. to Pet. for Cert. B–9. Six other medical experts, including the State's expert, Dr. Tuchler, affirmed the need for testing. Pet. for Cert. 7. Without such testing, Dr. Bindelglas could offer only a tentative opinion at trial. Clearly, then, Dr. Bindelglas' ability to contribute to petitioner's defense was impaired unreasonably by the State's refusal to provide access to diagnostic testing.

The trial court's reliance on Dr. Masland's opinion that testing would be superfluous—an opinion not shared by *any* of the other doctors—does not justify its denial of access to testing. *Ake* requires the appointment of a psychiatrist who will assist in the preparation of the defense, not one who will merely give an independent assessment to the judge or jury. 470 U. S., at 83. Although a judge or jury may choose to believe the State's experts rather than the defendant's at trial, a court may not permit the State's experts to determine what resources the defendant's experts may use. To allow such a veto power is akin to permitting a prosecutor to decide on what cases defense counsel may rely or what witnesses he may call. As long as the defendant makes the threshold showing of the need for testing, the court must provide access to it.

The Arizona Supreme Court affirmed the trial court's decision in part on the assumption that the necessary testing would have to be performed out of state and would last four to six weeks, thus imposing substantial costs on the State and creating a security problem. 159 Ariz., at 537, 768 P. 2d, at 1182. The court based this assumption on Dr. Bindelglas' request that Vickers be tested in a California hospital "if at all possible" because the Arizona State Hospital might have been prejudiced in favor of its previous diagnosis and might not perform the job adequately. App. to

Pet. for Cert. B–9. The trial court, however, never sought a compromise; it refused to provide for testing altogether. Any problem posed by sending Vickers to California is a red herring, then, to the extent that less burdensome testing would have satisfied the State's obligation. If, however, the testing procedure suggested by Dr. Bindelglas was in fact the only adequate means of arriving at a medically sound diagnosis, the burden on the State does not justify denying that testing. As we held in *Ake*, the State's interest in preserving its fisc is not substantial when compared with the compelling interest of both the defendant and the State in the fair and accurate adjudication of a criminal case, particularly one in which the defendant's life is at stake. 470 U. S., at 78–79.

Finally, the Arizona high court maintained that further testing was of "questionable value" to petitioner's insanity defense and that the risk of an erroneous judgment was minimal because three state experts testified that Vickers was not insane at the time of the offense. 159 Ariz., at 537, 768 P. 2d, at 1182. This reasoning wrongly subjects *Ake* claims to harmless-error analysis. In *Ake*, we did not endeavor to determine whether the petitioner's case had been prejudiced by the lack of a psychiatrist. Rather, we determined that, in general, psychiatric assistance is of extreme importance in cases involving an insanity defense, *id.*, at 79–82, and that without that assistance "the risk of an inaccurate resolution of sanity issues is extremely high," *id.*, at 82. Because the petitioner had made the threshold showing that his sanity was a significant issue at trial and the State had failed to offer psychiatric assistance, we reversed and remanded for a new trial. In this case, then, the trial testimony of the State's experts is irrelevant. Vickers' sanity was a significant issue at trial and testing was necessary for his psychiatrist to perform his *Ake* function. Because the trial court nevertheless refused to require the State to provide access to the requisite testing, Vickers is entitled to a new trial.

Our decision in *Ake* v. *Oklahoma* recognized the right of an indigent defendant to a competent court-appointed psychiatrist when his sanity is seriously in question. To deprive a defendant of diagnostic testing necessary for the psychiatrist to perform adequately his *Ake* function renders that right meaningless. I therefore dissent from the denial of certiorari.