**David Lee STARR, Appellant,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Corrections, Appellee.**

No. 92–1466.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1993.

Decided May 2, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied June 10, 1994.*

---

2. Clearly, 21 U.S.C. § 860 supports the district court's view on the matter.

* Judges Fagg, Bowman and Loken would grant the suggestion.

Jack Lassiter, Little Rock, AR, argued, for appellant.

Kyle R. Wilson, Little Rock, AR, argued, for appellee.

Before MCMILLIAN and BEAM, Circuit Judges, and HAMILTON,** District Judge.

BEAM, Circuit Judge.

David Lee Starr was convicted of capital murder and sentenced to death by the State of Arkansas. After exhausting his state remedies, he filed a petition for a writ of habeas corpus under 28 U.S.C. § 2554. The district court denied Starr's petition without holding an evidentiary hearing. We find that Starr was denied Sixth and Fourteenth Amendment rights at the sentencing phase of his trial. As a result, his death sentence is based on an aggravating factor which is impermissibly vague under the Eighth Amendment. We also find that Starr was sentenced in violation of his right to due process of law. We therefore reverse and remand with instructions to the district court to issue the writ.

## I. BACKGROUND

David Lee Starr attacked seventy-six year-old Gladys Ford while she was sweeping her sidewalk on a June morning in 1985. He struck her on the head with an iron pipe and then "helped" her into her home, where he struck her again. The two blows shattered Mrs. Ford's skull in five places and caused her midbrain to separate from her main-brain, rendering her unconscious. Starr proceeded to search each room of Mrs. Ford's home for money but found only a pistol. He

---

** The HONORABLE JEAN C. HAMILTON, United States District Judge for the Eastern District of Missouri, sitting by designation.

then carried Mrs. Ford into her bedroom and raped her. Starr attempted to hide his crime by covering the trail of Mrs. Ford's blood with bedding and then fled through a window. Mrs. Ford died shortly thereafter.

Immediately after his arrest, Starr denied any involvement in Mrs. Ford's murder. Later, he asked to speak with the police. After accompanying police to the murder scene, Starr gave a statement and admitted being at the crime scene. He indicated that his girlfriend had been the murderer and told police where the murder weapon was hidden. Shortly thereafter, Starr confessed, step-by-step, to the entire crime. In addition, Starr's palm print was found next to Mrs. Ford's body, Mrs. Ford's pistol was found at the house where Starr was arrested, Starr knew intimate details of the crime, and the semen recovered from Mrs. Ford is of a type found in only eight percent of the male population which includes Starr. In short, the evidence against Starr was overwhelming.

In October of 1986, Starr was convicted of capital murder and sentenced to death. His strategy at trial, and at his sentencing, was to present evidence of diminished capacity based on his mental retardation. This strategy failed. After receiving the death sentence, Starr appealed to the Arkansas Supreme Court which affirmed his conviction and sentence. *Starr v. State*, 297 Ark. 26, 759 S.W.2d 535 (1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989). Subsequently, Starr petitioned for collateral relief from his conviction and sentence under Rule 37 of the Arkansas Rules of Criminal Procedure. Starr's petition was denied. *Starr v. State*, 1989 WL 136313, 1989 Ark. LEXIS 517 (Ark. Nov. 13, 1989) (per curiam), *cert. denied*, 494 U.S. 1020, 110 S.Ct. 1327, 108 L.Ed.2d 502 (1990). Starr then filed his federal petition for a writ of habeas corpus in the district court and requested an evidentiary hearing on four issues. The district court denied Starr's request for an evidentiary hearing and denied his petition. Starr appeals.

## II. DISCUSSION

We must reverse the district court's denial of the writ although there is no doubt that David Lee Starr committed the acts which resulted in Mrs. Ford's death. We reverse on two grounds, either of which would independently support reversal. That being true, we note that the combination of these grounds, together with other troubling aspects of the proceedings against Starr, render Starr's death sentence infirm.

### A. SIXTH AND FOURTEENTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Starr was entitled to effective assistance of counsel at his trial, sentencing, and at his appeal of right. *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984); *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985). Starr alleges that his counsel's failure to object to either the "pecuniary gain" or the "heinous, atrocious, or cruel" aggravating circumstances instruction at the sentencing stage constituted ineffective performance. We agree.

Because the facts are not in dispute, the district court, as it is permitted to do, decided this ineffective assistance claim on the record. *See Chandler v. Armontrout*, 940 F.2d 363, 366 (8th Cir.1991). We review questions of ineffective assistance based on an undisputed factual record *de novo*. *See Laws v. Armontrout*, 863 F.2d 1377, 1381 (8th Cir.1988), *cert. denied*, 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989).

Our scrutiny of defense counsel's performance is deferential. We presume counsel's conduct to be within the range of competence demanded of attorneys under like circumstances. *Strickland*, 466 U.S. at 687–89, 104 S.Ct. at 2064–65. However, when the appellant shows that defense counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would exhibit *under similar circumstances*," that presumption must fail. *Hayes v. Lockhart*, 766 F.2d 1247, 1251 (8th Cir.) (emphasis added), *cert. denied*, 474 U.S. 922, 106 S.Ct. 256, 88 L.Ed.2d 263 (1985).

In evaluating counsel's performance, we must take into consideration all the circumstances, including the fact that this was a

capital sentencing proceeding. The basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the state, and to present mitigating evidence. The state asserted two aggravating circumstances at Starr's sentencing hearing. They were: 1) "[t]he capital murder was committed for pecuniary gain;" and 2) "[t]he capital murder was committed in an especially heinous, atrocious, or cruel manner." The jury was instructed that it must find that either one or the other of the aggravating circumstances existed beyond a reasonable doubt in order to sentence Starr to death. At the time of Starr's sentencing, both of these aggravating factors had been found to be unconstitutional. *See Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (outrageously or wantonly vile, horrible or inhuman is an unconstitutionally vague aggravating circumstance); *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.) (pecuniary gain aggravating circumstance in burglary context is impermissible double counting), *cert. denied*, 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985). Despite the fact that a minimum of research would have revealed these cases, counsel failed to object to either aggravating factor as unconstitutional.

■ Since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), constitutional concern has been directed toward whether the aggravating circumstances used by states in death penalty proceedings adequately prevent the substantial risk of arbitrary and capricious imposition of the death penalty prohibited by the Eighth Amendment. Failure to investigate the constitutionality of the aggravating circumstances under which one's client is to be put in jeopardy of the death penalty falls well below the standard of representation required for capital defendants. *See Lockhart v. Fretwell*, — U.S. —, — n. 1, 113 S.Ct. 838, 842 n. 1, 122 L.Ed.2d 180 (1993).

### 1. Pecuniary Gain Aggravating Circumstance

■ In order to prevail on his ineffective assistance claim, Starr must also show prejudice in addition to deficient performance.

*Fretwell*, — U.S. at —, 113 S.Ct. at 842. The failure to discover that a likely meritorious objection could have been made to the pecuniary gain aggravating factor did not prejudice Starr because that factor was subsequently found to be constitutional. *Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.), *cert. denied*, 493 U.S. 959, 110 S.Ct. 378, 107 L.Ed.2d 363 (1989). As the Court explained in *Fretwell*, the failure to object to an aggravating circumstance which, at the time of trial, had been held unconstitutional by the relevant circuit court, but which was later deemed constitutional, does not result in ineffective assistance of counsel because there has been no prejudice to the defendant. *Fretwell*, — U.S. at — – —, 113 S.Ct. at 843–44. In such a case, counsel's deficient performance merely results in the defendant losing a legal windfall rather than a constitutional right to which he or she was entitled. Loss of a windfall does not constitute prejudice. *Id.* Thus, Starr cannot show prejudice by his counsel's failure to object to the pecuniary gain instruction.

### 2. Heinous, Atrocious, or Cruel Aggravating Circumstance

■ The district court found that Starr's counsel did not perform deficiently in failing to object to the "heinous, atrocious, or cruel" aggravating circumstance, on the ground that the impermissible vagueness of that instruction was a new rule that counsel was not required to foresee. We disagree.

In 1980, six years before Starr's sentencing proceeding, the Supreme Court reversed a jury's imposition of a death sentence which was based on the aggravating circumstance that the crime was "outrageously or wantonly vile, horrible, and inhuman." *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. at 1764–65. In *Godfrey*, the Court explained that such an aggravating circumstance instruction could not prevent a substantial risk of the arbitrary and capricious imposition of the death penalty. Such standardless discretion in the imposition of the death penalty violates the Eighth Amendment. *Id.* at 427–28, 100 S.Ct. at 1764–65.

The Supreme Court later held in *Maynard v. Cartwright*, 486 U.S. 356, 362–64, 108 S.Ct.

1853, 1858–59, 100 L.Ed.2d 372 (1988), that there is no functional difference between the "especially heinous, atrocious, or cruel" aggravating circumstance and the "outrageously or wantonly vile, horrible, and inhuman" aggravating circumstance rejected in *Godfrey.* Either instruction is too vague to adequately channel a death sentence determination for Eighth Amendment purposes.

Subsequently, the Supreme Court addressed the question of whether *Maynard*'s invalidation of the "heinous, atrocious, or cruel" aggravating circumstance created a new rule for the purposes of habeas review. *Stringer v. Black,* —— U.S. ——, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992). New rules, with few exceptions, are not available to those defendants seeking habeas relief whose convictions were final (i.e., who had exhausted all direct appeals) before the new rule was announced. *Teague v. Lane,* 489 U.S. 288, 311, 109 S.Ct. 1060, 1075–76, 103 L.Ed.2d 334 (1989); *see also Penry v. Lynaugh,* 492 U.S. 302, 314, 109 S.Ct. 2934, 2944, 106 L.Ed.2d 256 (1989). A decision is a new rule "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070. Precedent does not dictate the result in a given case when it is "susceptible to debate among reasonable minds." *Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). Applying this "new rule" standard, the Supreme Court held that *Maynard*'s invalidation of the "heinous, atrocious, or cruel" aggravating circumstance did not state a new rule. *Stringer,* —— U.S. at ——, 112 S.Ct. at 1135.

▪ Thus, the Supreme Court has determined that, after the 1980 *Godfrey* decision, reasonable minds could not fail to realize that the "heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague. We must therefore reject the district court's determination that counsel was not ineffective for failing to make this "novel" argument at trial. The argument was not "novel" in any sense of the word. The state's argument that Starr's counsel should not have been

expected to foresee the "expansion" of *Godfrey* to *Maynard* is completely circular, because as the state itself admits, *Maynard* was not an "expansion" of *Godfrey.* See *Stringer,* —— U.S. at ——, ——, 112 S.Ct. at 1135, 1140 (that *Maynard* is not a new rule is "a wise concession" by the State of Mississippi); *Newlon v. Armontrout,* 885 F.2d 1328, 1333 (8th Cir.1989) (*Maynard* is an application of, not an extension of, *Godfrey* and is therefore not a new rule), *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990). To be effective, counsel in capital cases must at least recognize and object to those sentencing factors which cannot reasonably be argued to be valid under existing law. We can conceive of no trial strategy that justifies a contrary approach, and therefore reaffirm our finding that Starr's counsel performed deficiently in failing to object to this aggravating circumstance.

▪ We now consider whether Starr suffered *Strickland* prejudice from counsel's deficient performance. To amount to prejudice, counsel's errors must have rendered the outcome of the preceding unreliable. *Fretwell,* —— U.S. at ——, 113 S.Ct. at 842. The Supreme Court has held that in weighing states such as Arkansas, the consideration of an invalid aggravating sentencing factor is fatal to the reliability of the sentence.[1] *Stringer,* —— U.S. at ——, 112 S.Ct. at 1137. Use of one invalid aggravating factor is fatal to a death sentence in a "weighing" state, even where the jury has found other valid aggravating circumstances, because the invalid factor operates as an impermissible "thumb" on death's scale. *Id.* Such a result is dictated by existing precedent and is not a new rule unavailable to habeas petitioners. *Id.* Starr's counsel's deficient performance therefore resulted in Starr being subjected to an unreliable determination that he should receive the death penalty. Such unreliability easily suffices to establish *Strickland* prejudice.

## B. DUE PROCESS

Starr's strategy at the guilt phase of his trial was to present evidence of diminished

---

1. In "weighing" states the jury must first find that at least one aggravating circumstance exists, then consider any evidence presented in mitiga-

tion, and finally find that the aggravating circumstances outweigh the mitigating circumstances before it can impose the death penalty.

capacity. His strategy at the sentencing phase was to argue that his diminished capacity and family background rendered him less morally culpable than a person of ordinary intelligence with a normal background. He thus hoped to be spared the death penalty.

Starr is one of fourteen children, and was raised in a functionally polygamous family until he was about seven. At that time Starr's father was shot and killed by his father-in-law.[2] Starr then moved in with his uncle and twenty-one to twenty-five children. His mother died shortly thereafter. Starr has spent time in institutions for the mentally retarded and has scored from thirty-nine to sixty-two on I.Q. tests. Even Starr's highest scores place him well within the mildly retarded or lowest one percent of the adult population in intelligence.

Starr requested that an expert be appointed to aid him in presenting his evidence of diminished capacity, at both the guilt and sentencing phases of his trial. The trial court denied the request, ruling that Starr's ability to subpoena the mental health professionals involved in his court ordered competency exam, which was conducted at the behest of a joint motion by the prosecution and defense, enabled him to present his defense and to prepare evidence in mitigation for the eventual penalty phase. We find this to have been error. *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (due process requires that indigent defendant be provided with access to a psychiatrist to aid in evaluation, preparation, and presentation of defense or mitigating evidence when the defendant's mental condition is a serious issue); *Little v. Armontrout,* 835 F.2d 1240 (8th Cir.1987) (en banc) (indigent defendants must be provided with expert assistance when they show a reasonable probability that an expert would aid in their defense, and that the denial of expert assistance would result in an unfair trial), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). While the question is close, we find any error at the guilt phase to have been constitutionally harmless. The error at the sentencing phase, however, mandates reversal.

### 1. Procedural Bar

The state argues that even if such *Ake* error exists, the issue is procedurally barred. We are perplexed by this contention. Before his trial commenced, Starr filed a motion for expert assistance and he objected to the motion's denial. He again raised the motion after his counsel obtained additional evidence concerning his family history and degree of mental retardation, when the need for an expert became more apparent. The trial court again denied his motion and Starr again registered his objection. Counsel thus preserved any *Ake* error made at trial or sentencing.

Although Starr did not artfully raise this aspect of the *Ake* issue on direct appeal,[3] the Supreme Court of Arkansas regularly reviews the merits of all issues raised at trial in capital cases to guard against fatal errors. *Ruiz v. Lockhart,* 754 F.2d 254, 256–57 (8th Cir.1985), *vacated on other grounds,* 476 U.S. 1112, 106 S.Ct. 1964, 90 L.Ed.2d 649 (1986). We have previously held that a court's independent review of the record for error overcomes the procedural bar as to those errors preserved in the record. *Id.* at 257. The Supreme Court of Arkansas performed its regular review in this case, *Starr v. State,* 759 S.W.2d at 540, and thus decided the merits of any *Ake* error. Furthermore, Starr clearly raised the *Ake* issue as to the appointment of an expert in his petition to proceed under Rule 37. Joint Appendix at 76. The Arkansas Supreme Court declined to consider the issue, ruling that it had been raised and resolved on direct appeal and was therefore unavailable for Starr's Rule 37 petition. Joint Appendix at 86. Because the issue was raised at trial, and later raised and addressed in the Arkansas Supreme Court, there is no procedural bar.

### 2. Expert Assistance

Upon the joint motion by the prosecution and defense, the Arkansas trial court ordered

---

**2.** Starr's father's legal wife was not Starr's mother.

**3.** On direct appeal, Starr, relying on *Ake,* challenged the adequacy of the court-ordered examination for purposes other than insanity and competency to stand trial.

Starr to be examined by doctors at the Arkansas State Mental Hospital to determine his competency to stand trial, his ability to understand the difference between right and wrong, and his ability to act accordingly. The experts concluded that Starr was "mildly retarded," but able to know right from wrong, able to conform his conduct to the law, and competent to stand trial. Based on the exam results, and on his personal dealings with Starr, defense counsel moved for the appointment of a mental health expert to assist Starr in developing evidence of diminished capacity and evidence of mitigating circumstances. Counsel estimated the cost of the requisite expert assistance to be $2,500. Starr's counsel informed the court that Starr was given to fits of uncontrollable anger, and that a mental health expert was necessary to aid counsel not only in developing the evidence of diminished capacity, but also to enable Starr to assist with his defense.

The state opposed the motion arguing that based on the results of the state exam already performed, the defendant had not met his burden to show that his mental condition was reasonably in issue and, therefore, the court had no duty to appoint an expert. In the alternative, the state contended that the defendant's access to the court-ordered report coupled with his ability to question the examiners in court provided Starr with the basic tools necessary for an adequate defense. The trial court denied the motion, agreeing with the state that Starr had not shown that his sanity was in issue. The court also agreed that Starr's ability to subpoena the experts who had performed the court-ordered exam satisfied any right Starr might have to psychiatric assistance. In so deciding, the trial court relied on *Andrews v. State*, 265 Ark. 390, 578 S.W.2d 585 (1979), an Arkansas Supreme Court case which predates *Ake*, and on its view that *Ake* did not require any more than the state exam which the defendant had already received.

*Ake* is one in a line of due process cases requiring that an indigent defendant be supplied with the basic tools necessary for an effective defense. *See* David A. Harris, *The Constitution and Truth Seeking: A New Theory on Expert Services for Indigent Defendants*, 83 J.Crim.Law & Criminology 469, 474–83 (1992). *Ake* establishes that one of the basic tools to which due process entitles indigent defendants is the services of court-appointed experts to "conduct ... appropriate examination[s] and [to] assist in evaluation, preparation, and presentation of [their] defense." *Ake*, 470 U.S. at 83, 105 S.Ct. at 1096. *Ake* also explains that, when appropriate, the right to expert assistance extends to the sentencing phase of capital proceedings. *Id.* at 86, 105 S.Ct. at 1097–98.

■ Although *Ake* was decided in the context of insanity rather than mental retardation, the Court extensively discussed the importance of psychiatric testimony to a defendant whose mental condition is crucial to his defense. *Id.* at 79–81, 105 S.Ct. at 1094–95. The Court also instructed that a defendant's interests in access to expert assistance outweigh the state's economic interests in avoiding the cost of an expert when the defendant's "mental condition" is seriously in issue in a capital case. *Id.* at 82, 105 S.Ct. at 1096. The Court's concern was heightened because *Ake*'s mental condition was his only defense. *Id.* at 86, 105 S.Ct. at 1097–98. Like Ake, Starr's mental condition was his only viable defense and his strongest argument in mitigation for sentencing purposes. Thus Starr's situation falls well within *Ake*'s dictates that a capital defendant whose mental condition is seriously in issue be provided with expert assistance.[4]

■ However, our cases have interpreted *Ake* to require the appointment of an expert only if the defendant shows "a reasonable probability that an expert would aid in his defense, and that denial of expert assistance would result in an unfair trial." *Little*, 835 F.2d at 1244; *see also Ake*, 470 U.S. at 82–83, 105 S.Ct. at 1096; *Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). Starr made that showing to the trial court. He presented the court with mental health records dating back

---

4. The Eighth Circuit has not limited the right to expert assistance to questions of sanity. *Little,*

835 F.2d at 1243.

to 1977 which showed that he had been diagnosed as being from mildly to moderately retarded. He also presented the results of his court-ordered competency exam, which confirmed that he was still mildly retarded. The examiners' report did not address or explain at what level a mildly retarded person functions, or how such retardation affected Starr's appreciation of the results of actions he admittedly knew were wrong.[5] Starr's counsel pointed out the inadequacy of the examination to the trial court and explained his inability to address these questions without expert assistance. These questions were crucial to Starr's defense and to his presentation of mitigating evidence in the penalty phase of the trial. Starr therefore met his burden of showing a reasonable probability both that an expert would aid in his defense and that denial of expert assistance would result in an unfair trial.

We also find the trial court's alternative finding, that Starr's due process right to expert assistance was satisfied by the court-ordered examination and by the defense's ability to subpoena the state examiners, to be erroneous on two grounds. First, the examination was not appropriate to Starr's needs. Second, the ability to subpoena a state examiner and to question that person on the stand does not amount to the expert assistance required by *Ake*.

### a. An Appropriate Examination

The inappropriateness of the available psychiatric examination was the key issue triggering the *Ake* decision. *Ake*, 470 U.S. at 72, 105 S.Ct. at 1090–91 (Ake had been examined for competency to stand trial, but not for his sanity at the time of the offense). As *Ake* explains, due process requires access to an expert who will conduct, not just any, but an appropriate examination. *Id.* at 83, 105 S.Ct. at 1096. We find that Starr's exam was inappropriate because it did not delve into the mitigating questions essential to Starr. As the Arkansas Supreme Court has recognized, the issue of mitigation, or diminished capacity, is different from that of guilt, *Neal v. State*, 274 Ark. 217, 623 S.W.2d 191, 193. The Arkansas Supreme Court has also noted that the exam and report statutorily mandated in Arkansas at the time of Starr's trial, and which Starr received, "is obviously not broad enough to cover everything a defendant might raise as a 'mental defect' basis of mitigation." *Coulter v. State*, 304 Ark. 527, 804 S.W.2d 348, 356, *cert. denied,* — U.S. ——, 112 S.Ct. 102, 116 L.Ed.2d 72 (1991). In *Coulter,* the defendant was not prejudiced by the trial court's denial of funds to procure the requisite *Ake* expert assistance to aid in the presentation of mitigating evidence because his appointed defense counsel had generously procured the needed expert with his own funds. *Id.* Starr was not so lucky.

We agree with the Arkansas Supreme Court that a report on the four statutorily mandated items[6] does not suffice to cover everything a defendant might raise as a "mental defect" in mitigation and for which an *Ake* expert is required. In Starr's case, the examination merely found Starr to be:

aware of the nature of the charges and the proceedings taken against him. He is ca-

---

**5.** Starr told police that he had "popped" Mrs. Ford and then "popped" her again after he "helped" her into her home, when she attempted to rise. He also told them that he hadn't intended to kill her. The extent of Starr's comprehension of his own strength and of the likelihood that "popping" Mrs. Ford on the head with an iron pipe would result in death are questions which an *Ake* expert could have developed for the jury. A parallel line of inquiry would have been into Starr's level of premeditation in relation to the eventual rape of Mrs. Ford.

**6.** A defendant is entitled to a referral to state mental health examiners after filing notice with the court that "there is reason to believe that mental disease or defect of the defendant will or

has become an issue in the cause." *Coulter,* 804 S.W.2d at 356. The examiners must provide:

(1) A description of the nature of the examination;

(2) A diagnosis of the mental condition of the defendant;

(3) An opinion as to his capacity to understand the proceedings against him and to assist effectively in his own defense;

(4) An opinion as to the extent, if any, to which the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired at the time of the alleged conduct.

*Id.*

pable of cooperating effectively with an attorney in the preparation of his defense. At the time of the commission of the alleged offense, the defendant did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

State Trial Transcript at 54. These conclusions can only establish that Starr is criminally responsible for his acts, not the degree of such responsibility. The difference between Starr's perceptions of the probable results of the acts he committed and those of a person of normal mental capabilities, a crucial issue for Starr, was not addressed either by the report or the underlying examination. The issue was crucial because in our system of criminal justice acts committed by a morally mature person with full appreciation of all their ramifications and eventualities are considered more culpable than those committed by a person without that appreciation. *See Penry,* 492 U.S. at 322–23, 109 S.Ct. at 2948–49; *Ford v. Wainwright,* 477 U.S. 399, 406–10, 106 S.Ct. 2595, 2600–02, 91 L.Ed.2d 335 (1986); Kerrin M. McCormick, *The Constitutional Right to Psychiatric Assistance: Cause for Reexamination of Ake,* 30 Amer.Crim.L.J. 1329, 1336 (1993). For this reason, Starr needed an expert to make an appropriate examination and to explain the effects of his retardation on his relative culpability at the sentencing phase of the proceedings.[7]

The inadequacy of the examination is illustrated by the testimony of the examining psychologist. The psychologist testified that Starr was mildly retarded, but was unable to explain to the jury the level of Starr's social and intellectual functioning because his tests had not dealt with that. Nor was he able to interpret or explain the results of previous mental health tests, which assigned Starr the mental age of a six or seven year old, because he was not familiar with the methodology of those tests. Nor could he explain what it meant, in either psychological or lay terms, for an adult male to have the mental age of seven. The state psychologist apologized, on the record, for his inability to meet the defense's needs. At best, he could explain that Starr was in the lower one percent of the population in intelligence and was obviously not a genius.[8] Thus we find that Starr was denied the appropriate examination to which due process entitled him.

### b. Assistance in the Evaluation, Preparation, and Presentation of the Defense

█ The trial court concluded that Starr's ability to subpoena the state examiners and to question them on the stand, coupled with the court's payment for their travel expenses from Little Rock, sufficed to provide Starr with the expert assistance to which he may have been entitled. We disagree. While due process admittedly does not give defendants the right to assistance from their experts of choice, it does give appropriate defendants the right to experts who will "assist in evaluation, preparation, and presentation of the defense." *Ake,* 470 U.S. at 83, 105 S.Ct. at 1096. Before *Ake,* the ability to subpoena and question a neutral expert on whose examination both the

---

7. We note that although the mitigating evidence question has usually come up in the context of sentencing as opposed to guilt determinations, evidence of diminished capacity may be relevant at both phases. The question of mental condition cannot be neatly divided into sanity at the time of the offense as the relevant issue at the guilt phase, and mitigating evidence as the relevant issue at sentencing. If the question could be so divided, Starr's exam might have been appropriate at least for the guilt phase. However, a defendant's limited understanding of the probable results of his actions could easily affect whether a jury finds the specific intent necessary for a first or second-degree murder verdict, or for certain capital murder verdicts. At the time of the request for an expert, Starr was facing charges of first-degree premeditated murder, sec-

ond-degree murder, and capital felony murder. His intellectual understanding of his actions and their gravity was therefore clearly in issue at both phases of the proceedings.

8. We see no rational reason that a defendant be allowed an *Ake* expert only if the prosecution is relying on an opposing expert. Often, one party needs expert testimony to explain that conditions are other than they superficially seem to be, while the opposing party is content with the lay person's unaided assessment of the situation. Without an expert who had performed an adequate exam, Starr was unable to address the prosecution's contention that "mild" retardation was essentially no retardation.

state and the defense were relying may have satisfied due process. *See United States ex rel. Smith v. Baldi*, 344 U.S. 561, 568, 73 S.Ct. 391, 394–95, 97 L.Ed. 549 (1953) (due process satisfied when insanity defendant is examined by neutral psychiatrists on issue of insanity, and those experts testify). However, *Ake* expressly disavows the result in *Smith* and explains that the requirements of due process have fundamentally changed since that decision. *Ake*, 470 U.S. at 85, 105 S.Ct. at 1097.

*Ake* explains that *Smith* was decided before the Supreme Court had found that the Constitution afforded indigent defendants in state court the right to appointed counsel, much less appointed experts. *Smith* was also decided before expert testimony became so pivotal to litigation that, in appropriate cases, experts must be considered to be basic tools necessary for an adequate defense. *Ake*, 470 U.S. at 77, 79–82, 105 S.Ct. at 1093, 1094–96. Thus, the Court explains that its disagreement with *Smith* is "fundamental." *Id.* at 85, 105 S.Ct. at 1097.

Like appointed counsel, experts appointed under *Ake* are to aid the defendant and function as a "basic tool" in his or her defense. *Id.* at 77, 105 S.Ct. at 1093. To so function, they must be available to "assist in evaluation, preparation, and presentation of the defense." *Id.* at 83, 105 S.Ct. at 1096. Such availability and assistance requires more than permission to subpoena an expert and question him or her on the stand.

### 3. Harmless Error

Having decided that the trial court erred in not appointing an *Ake* expert, we must consider whether harmless error analysis is appropriate, and if so, which analysis applies.

 Harmless error inquiry has been applied to numerous constitutional mistakes. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967). Certain structural errors, however, can never be harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 307–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991). Our cases have, at least implicitly, applied a harmless error analysis to *Ake* type errors. *Little*, 835 F.2d at 1245

(reversing where denial of expert probably had material impact on trial). Despite the late Justice Marshall's contrary opinion, *Vickers v. Arizona*, 497 U.S. 1033, 1037, 110 S.Ct. 3298, 3300, 111 L.Ed.2d 806 (1990) (Marshall, J., dissenting to denial of certiorari), we believe that the inferential holding in *Little* is correct and that the denial of an *Ake* expert is the sort of constitutional omission that is subject to harmless error analysis.

Mistakes which have been regarded as so elemental that their existence abrogates the basic structure of a constitutional trial, and which are therefore not subject to harmless error analysis, include the deprivation of the right to counsel, trial by a biased judge, exclusion of members of the defendants' race from the grand jury, deprivation of the right to self-representation, and denial of the right to a public trial. *Fulminante*, 499 U.S. at 309–10, 111 S.Ct. at 1264–65. Thus, the issue becomes whether the denial of an *Ake* expert is a defect abrogating the constitutional structure of a trial or mere trial error. We think it is trial error.

Despite *Ake*'s explanation that experts are a basic tool of an adequate defense, analogous to appointed counsel, we note that the denial of an appropriate expert is not parallel to the deprivation of the right to counsel. A defendant has no burden to meet to invoke the right to counsel. *Ake*, however, requires a defendant to make a threshold showing of the relevance and the helpfulness of the expert's services. We do not believe that a right to which a defendant is not entitled absent some threshold showing can fairly be defined as basic to the structure of a constitutional trial.

We find that the denial of an *Ake* expert is more analogous to the situation where counsel has performed deficiently, than to the situation where the right to counsel has been denied altogether. Like deficient performance of counsel, the denial of an *Ake* expert deprives the defendant of a tool basic to the preparation of his defense, but circumstances may render the lack of that tool a mere inconvenience, rather than a total disability, and prejudice may not result. For example, in *Coulter*, 804 S.W.2d at 357, the lack of a court-appointed expert did not prejudice the

defendant because counsel financed the expert from his own pocket. Because *Ake* error is trial error, and may result in no prejudice to the defendant, it is subject to harmless error analysis.

There are, however, two separate harmless error analyses for the denial of constitutional rights. The first, whether the error was harmless "beyond a reasonable doubt," is known as *Chapman* analysis. The second, whether the error "had substantial or injurious effect or influence in determining the jury's verdict," is the analysis now normally used on habeas review. *Brecht v. Abrahamson*, — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Because state courts are required to apply *Chapman* analysis on direct review, it makes little sense to require federal habeas courts to engage in an identical analysis and thereby undermine the finality of state convictions which have survived direct review. *Orndorff v. Lockhart*, 998 F.2d 1426, 1430 (8th Cir.1993). In *Orndorff*, we addressed the question of which standard was appropriate, on habeas review, for constitutional error which the state courts have not had any opportunity to address. *Id.* We concluded that *Brecht*'s reasoning was inapplicable in those situations, and that *Chapman* was the appropriate standard. *Id.*

■ In Starr's case, the state courts have had an opportunity to review the *Ake* problem, but found that there was no constitutional error. The question then becomes which standard of review is appropriate if the state courts had the opportunity to address the constitutional error under the *Chapman* standard but did not do so because they found that there was no error. This question was left open in *Hoversten v. Iowa*, 998 F.2d 614, 617 (8th Cir.1993). *Orndorff* purported to answer it, but because that case had a

different posture, its answer is not controlling. We believe, however, that the reasoning in *Orndorff* applies equally to Starr's situation. Considering an issue and finding no error does not carry with it an implicit *Chapman* analysis,[9] and thus *Brecht* does not apply.

■ We now consider whether the *Ake* error was harmless beyond a reasonable doubt at either the guilt or sentencing phases. At the guilt phase Starr faced first-degree, second-degree, and capital murder charges. The state had the burden of showing premeditation for the first-degree charges, extreme indifference or knowing conduct for second-degree murder, and burglary or rape and extreme indifference in the capital murder charge.[10] Starr's retardation is relevant to his level of premeditation and to whether he purposefully killed Mrs. Ford. However, the jury convicted him of capital murder, in which only burglary, rape, and extreme indifference are relevant. There is no question that Starr had the intent to steal from Mrs. Ford, or that he knew that he was raping her. Expert testimony as to his mental retardation would have been irrelevant to those issues. Further, whether or not Starr realized he had mortally injured Mrs. Ford is irrelevant to whether he was acting with extreme indifference to that possibility. There is no doubt that Starr knew he was seriously injuring Mrs. Ford, that he intentionally inflicted the injury to incapacitate her, and that he left her lying in a sea of blood without summoning help. Nothing an *Ake* expert could say would change those facts or change that showing of extreme indifference. Thus, while expert testimony might have helped Starr's case with respect to the first- and second-degree murder

---

9. For example, a state court could find a confession admissible because it was not coerced. If the confession was later found to have been coerced, its admission could not be presumed to have been determined to be harmless beyond a reasonable doubt simply because the state court had considered the issue of admissibility. In fact, it would be unusual for such an error to be harmless beyond a reasonable doubt. Thus, absent an alternative holding that even if there was error, it was harmless beyond a reasonable doubt, we will apply the *Chapman* analysis.

10. The capital murder charge was as follows:

David Lee Starr is charged with the offense of capital murder. To sustain this charge, the State must prove the following things beyond a reasonable doubt:

First: That David Lee Starr committed the crime of burglary or rape; and

Second: That in the course of and in furtherance of that crime, caused the death of Gladys Ford under circumstances manifesting an extreme indifference to the value of human life.

Trial Transcript at 1353.

charges, such an expert could not have helped Starr on the capital charge. Since it was on the capital charges that Starr was convicted, we find that the *Ake* error in the guilt phase was harmless beyond a reasonable doubt.

■ The sentencing phase presents a different question. The prosecution, relying on the court-ordered examination, repeatedly emphasized that Starr's retardation was "mild" and did not prevent him from knowing right and wrong. The prosecution argued[11] to the jury that because the state examination revealed Starr's ability to tell right from wrong, and his ability to conform his conduct to law, its concurrent finding that he was "mildly" retarded should not be considered a mitigating factor in sentencing. This argument highlighted the inappropriateness of the court-ordered examination, and exacerbated the resultant harm to Starr. In short, the entire sentencing phase turned on the effects of Starr's retardation on his perception and understanding of the cruelty and gravity of his acts, the issue for which he was denied an *Ake* expert. Thus, we cannot find the error at sentencing to be harmless beyond a reasonable doubt.[12] Further, as the above discussion of the prejudice to Starr makes abundantly clear, the error would not be harmless even were we applying the less stringent *Brecht* standard of review.

## C. OTHER ISSUES

Starr raises a number of other issues which we have carefully examined and find to be without merit. These issues include: a number of other allegations of ineffective assistance of counsel; a contention that the district court erred in denying an evidentiary hearing on Starr's allegation that his arrest was illegal; and a contention that the district court erred in finding Starr's confession to be voluntary.

■ First, we address the ineffectiveness claims. We find that counsels' request of a first-degree premeditated murder charge, rather than a first-degree felony murder charge, to be the sort of strategic decision we will not second-guess in hindsight. We find that our grant of the writ renders moot Starr's claim that counsels' failure to request clarification of the jury's findings on mitigation was ineffective assistance.[13] We also find that the question of counsels' failure to object to the prosecution's improper remarks

---

**11.** The prosecution also made improper remarks to the jury in its closing argument at sentencing. The prosecutor told the jury that he had further evidence which he had not presented which would make them more inclined to impose the death penalty, and, having presented no evidence as to future dangerousness, argued that the death penalty was the only way to keep Starr from killing again. *See Darden v. Wainwright,* 477 U.S. 168, 180, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (improper to argue that the death penalty is the only guarantee against future crimes). Although these improper arguments did not so infect the sentencing procedure with unfairness as to deprive Starr of due process, they do add to the infirmity of Starr's sentencing procedure.

**12.** Further indicia of the probable value of *Ake* expert testimony is that even without the benefit of such testimony, the jury seriously considered life without parole, as evidenced by its question to the judge as to whether Starr could be paroled if he received that sentence. The trial judge refused to answer the question, other than to refer the jury back to their instructions. The question of whether a death penalty jury must be instructed on the exact meaning of life without parole in order to carry out their constitutional function is now pending before the Supreme Court. *State v. Simmons,* 427 S.E.2d 175 (S.C.),

*cert. granted,* —— U.S. ——, 114 S.Ct. 57, 126 L.Ed.2d 27 (1993).

**13.** This claim of ineffectiveness is probably procedurally barred, but the confused state of the jury forms as to mitigating circumstances does further highlight the prejudice of the *Ake* error. The jury checked that they unanimously found mitigating circumstances to exist, but failed to indicate which ones. The jury failed to check the form by which they were to acknowledge the presentation of evidence as to any given mitigating circumstance, even if they were not convinced of its existence and did check the form indicating that there was no evidence of any mitigating circumstance presented. Retardation is evidence of a mitigating mental defect. *See Penry,* 492 U.S. at 302, 109 S.Ct. at 2937–38 (mild retardation is mitigating evidence which must be considered). A sentencer may not refuse at least to consider mitigating evidence. *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). Therefore, the jury should not have refused to acknowledge that Starr presented evidence as to retardation, even if they were not convinced that such evidence established the existence of the mental defect mitigating circumstance.

at sentencing to be moot, as well as being another strategic decision which we would not second guess.

■ Counsels' decision not to request instructions on diminished capacity or manslaughter in the guilt phase is also a strategic decision which dovetails with their strategic decision not to present either opening or closing arguments during that phase. Counsels' evident strategy was to put the state to its proof, and to save all their credibility for the sentencing phase. The record reveals that counsel fought tenaciously to exclude Starr's confessions, Mrs. Ford's pistol, and gruesome crime scene photos. Having lost those fights, counsel decided to reserve their ammunition for the sentencing phase, as evidenced by their eventual arguments to the jury. This may have been an unsuccessful, or even reckless strategy, but faced with overwhelming evidence of the brutal rape and murder of an elderly woman, we cannot say such a strategy amounts to ineffective assistance. Starr's further argument that counsel was ineffective in the timing of his motion to suppress Mrs. Ford's gun which was seized when Starr was arrested is simply meritless.

■ Starr's complaint regarding the district court's treatment of his allegation of an illegal arrest is also meritless. He received a full and fair hearing in the state court, which decided that despite a technically defective warrant, Starr's arrest fell within the *Leon* good faith exception. Therefore, as the state correctly argues, he may not raise this issue in habeas proceedings. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

■ Finally, Starr claims that his confessions should have been suppressed as being involuntary because of his retardation and because of subtle coercion. We review questions of voluntariness *de novo. Fulminante,* 499 U.S. at 287, 111 S.Ct. at 1252–53. Viewing the totality of circumstances, we find Starr's confessions to have been voluntary. *Id.* at 286, 111 S.Ct. at 1252. Starr was arrested early in the morning. After receiving a *Miranda* warning, he denied any knowledge of Mrs. Ford's murder. He initialed and signed the *Miranda* warning form. Later, he twice initiated conversations with the police and was given *Miranda* warnings each time. The record shows that the officers were unfailingly polite and respectful in dealing with Starr. There is simply no objective evidence of coercion in this record, subtle or otherwise.

■ Starr also claims that his waiver of *Miranda* rights could not be knowing and voluntary because he could not understand those rights. However, the police were very calm and deliberate in their questioning of Starr. They gave him *Miranda* warnings each time they spoke with him. Starr represented to them that he did understand and waive his rights. His responses to questions were lucid, appropriate, and reflected complete understanding of what was said to him. In view of the record of Starr's conversations with police, his assertion that he did not understand his rights is not credible.

## III. CONCLUSION

Because Starr's sentence is based on the consideration of an invalid sentencing factor, and because he was denied the aid of an *Ake* expert to assist him in evaluating, preparing, and presenting his retardation as a mitigating circumstance, we reverse and remand to the district court with instructions to issue the writ granting Starr habeas corpus relief. The writ should give the state the option of conducting a new sentencing proceeding or reducing Starr's sentence to life without parole.

McMILLIAN, Circuit Judge, specially concurring.

I agree that the writ of habeas corpus should be granted. I write separately because I would hold that errors under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (*Ake*), are per se reversible, and thus do not require a showing of prejudice. In *Ake,* the Supreme Court held that the state must appoint a psychiatric expert for a criminal defendant if the defendant can show that his or her sanity will be a "significant" issue at trial. *Id.* at 83, 105 S.Ct. at 1096. The Court reversed and remanded after it found that the defendant had

met the above standard and had not been provided the necessary expert. *Id.* at 86–87, 105 S.Ct. at 1097–98. The Court did not examine whether the lack of the expert had prejudiced the defendant.

The majority's opinion concludes that the denial of the *Ake* right cannot be a fundamental error under the Supreme Court's standard in *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). The Supreme Court's holding in *Ake,* however, is based on a determination that the denial of the psychiatric expert, when the defendant meets the threshold test, creates an extremely high probability of an erroneous factual determination. 470 U.S. at 82, 105 S.Ct. at 1096. In my view, an error which creates an extremely high probability of an erroneous resolution of a "significant" issue certainly strikes at the structural framework of the proceeding. *See Arizona v. Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265.

Moreover, Justice Marshall, the author of *Ake,* dissenting from the Court's denial of certiorari in *Vickers v. Arizona,* 497 U.S. 1033, 1037, 110 S.Ct. 3298, 3300, 111 L.Ed.2d 806 (1990) (citations omitted), explained that *Ake* did not set out a prejudice requirement:

[The reasoning of the Arizona Supreme Court] wrongly subjects *Ake* claims to harmless-error analysis. In *Ake,* we did not endeavor to determine whether the petitioner's case had been prejudiced by the lack of a psychiatrist. Rather, we determined that, in general, psychiatric assistance is of extreme importance in cases involving an insanity defense, and that without that assistance "the risk of an inaccurate resolution of sanity issues is extremely high." Because the petitioner had made the threshold showing that his sanity was a significant issue at trial and the State had failed to offer psychiatric assistance, we reversed and remanded for a new trial.

Finally, I do not read *Little v. Armontrout,* 835 F.2d 1240 (1987) (en banc), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988), to apply harmless-error analysis to an *Ake* claim. In that case this court concluded that an expert was required under

*Ake* to help the defendant address identification testimony obtained through hypnosis. 835 F.2d at 1244–45. I read the sentence cited at page 18 of the court's opinion as addressing whether the defendant had satisfied the threshold standard for appointment of an expert.

Accordingly, I would hold that an *Ake* error does not require a showing of prejudice.